ELYNN EISS, EXECUTRIX OF THE ESTATE OF
ALLEN EISS, DECEASED

V.

FREDERICK P. LILLIS, M.D.

Record No. 840608

June 12, 1987

Present: Carrico, C.J., Poff, Compton, Stephenson, Russell, and Thomas, JJ., and
Cochran, Retired Justice

*Thomas P. Mains, Jr.* for appellant.
*Joseph J. Perez (R. Harrison Pledger, Jr.*, on brief), for appellee.

THOMAS, J., delivered the opinion of the Court.

This is a medical malpractice action in which plaintiff's decedent, Allen Eiss (Eiss or decedent) died from intercranial bleeding which resulted from an overdose of the "blood thinning" drug Coumadin. The defendant, Dr. Frederick P. Lillis, contended that the decedent was contributorially negligent because he took aspirin while taking Coumadin. The central issue is whether the trial court erred in permitting the jury to consider the question of the decedent's contributory negligence.[1]

Defendant failed to plead contributory negligence in a timely manner. However, the trial court was of the view that contributory negligence was shown by plaintiff's evidence. Thus, the trial court concluded, based on Rule 3:16(d)[2] of the Rules of this Court, that it was appropriate to submit the question of decedent's contributory negligence to the jury.

In light of its conclusion, the trial court granted the following instructions:

You shall find your verdict for the plaintiff i[f] she has proved by the greater weight of the evidence that:

---

[1] Appellant also assigns as error the trial court's action in permitting the defendant doctor and another to testify as expert witnesses even though they were not identified as such in answers to interrogatories. Given our disposition of the contributory negligence issue, we need not decide the discovery issues.

[2] That rule provides as follows: "Contributory negligence shall not constitute a defense unless pleaded or shown by the plaintiff's evidence."

(1) the defendant was negligent; and that

(2) the defendant's negligence was a proximate cause of the plaintiff's decedent's death, and that

(3) you do not find from the Plaintiff's evidence that the decedent was contributorily [sic] negligent, and that any such contributory negligence was a proximate cause of his death.

You shall find your verdict for the the defendant if:

(1) the plaintiff failed to prove either or both of the elements one and two above; or if

(2) you find from the greater weight of plaintiff's evidence that the plaintiff's decedent was contributorily [sic] negligent and that his contributory negligence was a proximate cause of his death.

The trial court entered judgment on a jury verdict in favor of defendant. We reverse.

Allen Eiss, age 46, was hospitalized twice within a thirty-day time period at Loudoun Memorial Hospital.[3] The first time was on January 25, 1979, when he complained of chest pains. He came under the care of Dr. Lillis, who diagnosed a mild heart attack. While in the hospital, Eiss was placed on Coumadin, a drug which lessens the tendency of the blood to clot.

Coumadin is considered dangerous because one of its major side effects is hemorrhaging. As a result, the dosage given to a patient must be individualized and stabilized. It usually takes 7 to 15 days to stabilize a dosage. The key method for stabilizing the dosage is taking prothrombin (PT) times of the patient and adjusting the dosage accordingly. The PT time is the amount of time it takes the blood to clot after a certain standard incision. The therapeutic range for Coumadin is 1.5 to 2.5 times the patient's normal or control clotting time.

From his first admission on January 25, 1979, to his first discharge on February 5, 1979, Eiss was given only three PT tests. The last test was on February 2, 1979, three days before his discharge. His PT time was never checked again until he was readmitted complaining of bleeding on February 25, 1979.

---

[3] Because pursuant to Rule 3:16(d) where contributory negligence is not pleaded it must be shown by the plaintiff's evidence, we limit our review of the evidence to that adduced in plaintiff's case.

The first PT test was given within twenty-four hours of the initial administration of Coumadin which occurred on January 26, 1979. Thereafter, Eiss received 10 milligrams of Coumadin each day. The second test showed a PT time of 18 seconds against a control of 10 seconds. The third test showed a PT time of 21 or 23 seconds against a control of 10 seconds. According to plaintiff's expert witness, the important thing about the PT tests given to Eiss is that the length of time required for clotting was increasing. The expert testified that as of the third test, there was no way to tell whether the dosage was acceptable and the patient stable because "the values were increasing."

After Eiss was discharged from his first hospitalization he continued to take Coumadin along with two other drugs. He also attended sessions at the hospital's cardiac treatment center. He had scheduled an appointment with Dr. Lillis for February 20, 1979. A snowstorm occurred that day and the appointment was rescheduled for February 26, 1979.

Mrs. Eiss testified that on Friday, February 23, 1979, Eiss mentioned that his leg hurt. On that same day, he went to the cardiac treatment center. There, he told one of the doctors about his leg hurting. The doctor told him to take aspirin. He started taking aspirin that Friday.

Mrs. Eiss testified further that on Saturday, Eiss "felt weak." She said that he stayed in bed most of that day. He told Mrs. Eiss that his gums were bleeding. Saturday night the Eisses went out to dinner. They did not stay because Eiss did not feel well.

By Sunday, Eiss was "really weak." His wife said that "he was really bleeding and he had a horrible headache." Eiss called the hospital and talked to Dr. Lillis. Mrs. Eiss then took Eiss to the hospital.

Mrs. Eiss said that Dr. Lillis talked to her in the emergency room and told her that Eiss' PT time was out of hand, that there was a lot of bleeding, and that Dr. Lillis wanted Eiss in the hospital. Mrs. Eiss saw her husband in the emergency room for a short time. She said that he "seemed a little bit disoriented."

When Eiss was readmitted on February 25, 1979, he gave his medical history to Dr. Lillis. Dr. Lillis noted that Eiss was admitted from the emergency room "because of bleeding." Dr. Lillis recorded that "in the last two or three days, [Eiss] had developed swelling of the calf, first left and now right." Dr. Lillis noted that there was tenderness and pain in the calf when walking and that

there was also some discoloration. The doctor also recorded that two days prior to Eiss' admission "he developed slight hematuria[4] which increased" on Saturday, the day before his readmission. Dr. Lillis noted further that Eiss complained of bleeding from his mouth. Also, Eiss had had a headache just over the eyebrows which had been present for several days. Dr. Lillis' history of Eiss noted, too, that, on the night prior to his readmission, Eiss had experienced a temperature of 102 degrees. The doctor noted that Eiss' PT time taken in the emergency room was 61 seconds over a control of 10 seconds, a figure which is 6 times normal. The doctor's impression was partly as follows: "Bleeding, due to Coumadin, with hematuria and bleeding into the right calf muscle."

In the discharge summary prepared by Dr. Lillis regarding Eiss' second admission, the doctor noted that "on the day before admission [Eiss] took about 12 aspirin." He also recorded that on examining Eiss his "urine showed 3+ protein, red cells too numerous to count." The discharge summary stated further that Eiss was given 10 milligrams of Vitamin K in an attempt to correct the PT time and the effect of the Coumadin.

The doctor's progress record contained an entry for 4:00 p.m. on February 25, 1979. It referred to bleeding in the urine, bleeding from a tooth, and swelling of Eiss' calves. It noted that these complaints were of two to three days duration. It recorded the PT time of 61/10 and the impression of bleeding secondary to Coumadin. Dr. Lillis' entry for 10:30 p.m. noted strange behavior on Eiss' part: wandering about the hall, entering the wrong room, and urinating on the floor. The doctor made a note that Eiss' wife had described him as "quite depressed." He also noted that Eiss was "very sleepy."

Susan Adams, a registered professional nurse, was on duty on February 25, 1979 on the 4:00 p.m. to 11:00 p.m. shift. She admitted Eiss to the hospital. Adams noted on the nursing history that Eiss "was sleepy. He was a bit difficult to elicit information from because he would go to sleep in mid sentence and it took a bit of prompting to have him continue with the thought." Adams remembered Eiss from his earlier stay in January. She said that his behavior on readmission was substantially different from what

---

[4] Hematuria means blood in the urine. Dorland's Illustrated Medical Dictionary 589 (26th ed. 1985).

it had been in January. She was concerned about Eiss' behavior. She said that over the course of the evening:

> He was a bit confused. At times some of his responses were a bit confused. He was found to be wandering in the hall, at one point, heading into another room in a rather state of disarray which was unlike him. He told me he was hunting for a place to vomit. He was amenable to general persuasion back to bed. He urinated on the floor behind the large chair in the room despite the fact the bathroom was even closer.

Adams conveyed her observations to Dr. Lillis in three separate telephone calls over the course of her shift.

Adams said the doctor came to the floor several times. She said that Eiss was given the 10 milligrams of Vitamin K ordered by Dr. Lillis but that Eiss did not receive any more Vitamin K. She stated further that on her shift Eiss did not receive blood or blood plasma. To her knowledge, no additional PT times were taken after the one in the emergency room which showed a clotting rate six times slower than normal. She noted that Eiss' "room was kept relatively dark all evening because the lights were aggravating the headache and vomiting." She said that when Eiss urinated on the floor they placed a plastic reagent stick in the urine and got a reading of two plus for blood, so they knew Eiss had blood in his urine, and she told Dr. Lillis what she had found. Adams said that when she went off duty the night of February 25, 1979, Eiss was responsive to verbal communication.

Mrs. Eiss stayed in the room with her husband starting about 1:30 a.m. on February 26, 1979. She said that they had given her husband a shot on February 25 and that there was a big bruise at the place he received the shot. Mrs. Eiss said that when she saw her husband in the early morning hours of February 26, 1979, he was sleepier and groggier but that he still talked to her. She said that when she held his hands they began trembling one at a time. Mrs. Eiss told the nurse about the trembling because she took the trembling to be a neurological sign of the type she was familiar with in dealing with epileptic children. She told the nurse that Eiss was showing neurologic signs. Mrs. Eiss was present when her husband urinated and said that it was red. She said that this was about 2:00 a.m. She testified further that at 4:00 a.m. her

husband refused to let the nurse take his temperature. Thereafter, he lay still, holding her hand and staring.

When Dr. Lillis visited at about 6:30 a.m. on February 26, Eiss was in a coma. He was transferred to another hospital where he died the next day of intercranial bleeding.

Dr. Burt Spilker testified as plaintiff's expert witness. In his opinion, "it was medically negligent for Mr. Eiss to have been discharged with only three prothrombin times, each one showing a gradual increase over the one before." It was also Dr. Spilker's opinion that it was medically negligent not to have had a PT test performed on Eiss at any time between his hospital discharge on February 2nd and his readmission on February 25th. With regard to the latter point, Dr. Spilker added that it was one of the most extreme cases of such negligence that he had ever encountered.

Dr. Spilker also opined that Dr. Lillis was negligent in treating Eiss when Eiss was readmitted. Dr. Spilker testified that Eiss was obviously bleeding, and that Dr. Lillis failed to treat him aggressively to counteract the bleeding. He said further that the fact that Eiss had a history of taking aspirin was even more reason for taking strong counteractive measures. According to Dr. Spilker, Eiss should have been put in an intensive care unit, given fresh frozen plasma, given whole blood, and monitored. Moreover, Dr. Spilker testified that the dosage of Vitamin K prescribed by Dr. Lillis was insufficient to be of therapeutic value. Dr. Spilker testified that these steps were taken when Eiss was transferred to the other hospital on the morning of February 26, but by that time it was too late to reverse the effects of what had already occurred.

Dr. Spilker testified as follows concerning the treatment Eiss received:

> There is no question whatsoever in my mind that the standard of care was not met in the treatment that he received at Loudoun Memorial Hospital when he went back for the second time in February, 1979 and was clearly negligent.

Dr. Spilker was asked whether Eiss would have survived with appropriate treatment. He replied as follows: "Yes, it is quite clear and there is no question in my mind and it is my opinion that he would have survived this hospitalization without problem had he been afforded adequate care."

In *Lawrence v. Wirth*, 226 Va. 408, 309 S.E.2d 315 (1983), we considered the question of contributory negligence by a patient in a medical malpractice context. There, the act of negligence charged was the physician's failure to discover, diagnose, and treat a malignant tumor. The patient in *Lawrence* complained of a specific lump which she had located in her breast. The physician did nothing to this lump. He found another lump which he deemed suspicious, performed a partial mastectomy, and found that lump to be benign.

After surgery, the patient felt the same lump of which she had complained previously. The physician told her not to worry unless it changed, and then to report the change. The patient noted a change but said nothing. The lump proved to be malignant. The doctor contended that the patient was contributorially negligent for failing to report the change when she first noted it. The trial court permitted the question of plaintiff's contributory negligence to go to the jury. We reversed.

■ We held that, in order for a plaintiff's negligence to bar recovery, it must concur with that of the defendant. We explained that, in the medical malpractice context, that means the patient's alleged contributory negligence must be contemporaneous with the main fact asserted as negligence on the doctor's part. Since the doctor's failure to discover, diagnose, and treat the malignant tumor preceded in time the patient's failure to notify him of a change in the tumor, we said the patient could not be contributorially negligent. *Id.* at 412-13, 309 S.E.2d at 317-18.

The main act of negligence complained of in this case is Dr. Lillis' failure "to adequately diagnose, treat, instruct, monitor and care for plaintiff's decedent, which failure proximately caused the death of plaintiff's decedent . . . ." When the basic allegations of the motion for judgment are thus called to attention, it becomes clear that the trial became side tracked on irrelevant and legally insignificant issues.

■ Dr. Spilker opined that Dr. Lillis was negligent in three particulars which may be summarized as follows: (1) releasing Eiss without stabilizing his PT times, (2) failing to monitor Eiss' PT times from February 2nd to February 25th, and (3) failing adequately to treat Eiss when he was readmitted to the hospital on February 25th. According to Dr. Spilker, the last stated act of negligence is what proximately caused Eiss' death. That is, then, the only alleged negligence which is of legal significance in this

case. The first two alleged acts of negligence described by Dr. Spilker are merely surplusage. The law is not concerned with the existence of negligence in the abstract; the law is only concerned with negligence that is the proximate cause of the injury complained of by the plaintiff. Here, the injury complained of was death.

Thus, the question is what did Eiss do, if anything, that was shown by his evidence to have been a proximate cause of his death. Dr. Lillis says that Eiss' taking aspirin was a proximate cause of Eiss' death. There was no evidence in the plaintiff's case to support this contention.

■ By the time Eiss was readmitted on February 25, 1979, he had already taken the aspirin; he was already bleeding. The aspirin was, by that time, merely a factor that the doctor had to take into consideration in treating Eiss. If aspirin compounds the effect of Coumadin — which the expert testimony shows it does — then Dr. Lillis, who knew of the Coumadin and of the aspirin, was bound to treat for both. He cannot successfully contend that he is not liable for Eiss' death because had Eiss not taken aspirin, Eiss would not have needed a doctor. Dr. Spilker testified that Eiss' history of taking aspirin was all the more reason for Dr. Lillis to have treated him aggressively and with dispatch.

Were we to accept Dr. Lillis' argument, in any case where the patient was responsible for events that led to his hospitalization, the treating physician would not be liable for negligent treatment. We reject this argument. *See Whitehead* v. *Linkous,* 404 So. 2d 377 (Fla. Dist. Ct. App. 1981); *Sendejar* v. *Alice Physicians & Surgeons Hosp., Inc.,* 555 S.W.2d 879 (Tex. Ct. App. 1977). Thus stated, the proposition is obviously wrong.

■ This case presents the obverse of *Lawrence.* There, the contention was that events *after* the doctor's negligence amounted to contributory negligence. Here, the contention is that events *before* the doctor's alleged negligence amounts to contributory negligence. The result must be the same in both cases, because the patients' conduct and the main act of negligence ascribed to the doctors were not contemporaneous and could not concur.

We hold that it was error for the trial court to allow the jury to consider the question of decedent's contributory negligence.

Therefore, we will reverse the judgment of the trial court and remand the case for a new trial consistent with this opinion.

*Reversed and remanded.*