Ernest NELSON, Jr., Appellant,

v.

Maurice L. McCREARY, M.D., Appellee.

No. 95–CV–1541.

District of Columbia Court of Appeals.

Argued Jan. 28, 1997.

Decided May 22, 1997.

---

John E. Carter, for appellant.

Robert J. Farley, for appellee.

Before SCHWELB and RUIZ, Associate Judges, and GALLAGHER, Senior Judge.

SCHWELB, Associate Judge:

In this action for medical malpractice brought by Ernest Nelson against Maurice L. McCreary, M.D., the jury returned a verdict in Dr. McCreary's favor. On appeal, Mr. Nelson contends, *inter alia,* that the trial judge erred by declining to instruct the jury on a significant part of the plaintiff's theory of the case. We agree, reverse the judgment, and remand the case for a new trial.

## I.

## THE FACTS

In 1985, physicians discovered that Mr. Nelson was suffering from cancer of the rectum. The progress and size of the tumor required highly invasive surgery. In what we shall call Operation No. 1, Mr. Nelson's surgeons removed the tumor, resectioned the bowel, sutured the anus shut, crafted an opening (called a colostomy) on the left side of Mr. Nelson's abdomen, and reattached the bowel to the new opening. They completed the operation by attaching a colostomy bag to the new opening to collect waste materials passing through Mr. Nelson's bowel.

In August 1989, Mr. Nelson consulted Dr. Maurice McCreary about a hernia that had developed near the site of the colostomy. Dr. McCreary recommended an operation to repair the hernia. He suggested that the colostomy be resited on the right side of Mr. Nelson's abdomen. Dr. McCreary explained to Mr. Nelson that if the colostomy was not resited in this manner, there would be a greater likelihood that the hernia would recur. Mr. Nelson nevertheless requested that the colostomy remain on the left side.

On September 7, 1989, Dr. McCreary performed Operation No. 2. He repaired the hernia with Marlex mesh, a surgical webbing material, and resited the colostomy a little higher on the left side of Mr. Nelson's abdo-

men. Complications ensued, however, and Dr. McCreary recommended further surgery to remedy a bowel obstruction.

On September 22, 1989, Dr. McCreary performed Operation No. 3. During the operation, he discovered that the surgical webbing had adhered to the surrounding tissue and appeared to be constricting the colostomy. Dr. McCreary attempted to release the Marlex mesh surrounding the colostomy. He completed the operation by enlarging the tunnel from the abdominal wall until it had the size of two adult fingers.[1]

Despite Operation No. 3, Mr. Nelson's condition continued to deteriorate. On October 13, 1989, he checked himself into the hospital. At this time, he was complaining of abdominal pain, seepage from the colostomy wound, vomiting, and weight loss.

On October 26, 1989, Dr. McCreary performed Operation No. 4. He discovered that the Marlex mesh appeared to be harboring an infection that was causing Mr. Nelson's continued illness. Dr. McCreary removed a portion of the Marlex mesh. He then moved the colostomy to the right side of Mr. Nelson's abdomen, making an opening which was the size of three adult fingers.[2]

Soon thereafter, Mr. Nelson developed an infection on the left side of his abdomen near the site of his previous colostomy. Mr. Nelson consulted with Dr. Jerome Canter, who recommended yet another operation. On July 30, 1990, in Operation No. 6, Dr. Canter opened Mr. Nelson's abdomen once again. He discovered that portions of the small bowel had adhered to the mesh and to the incision. Dr. Canter cut away the adhesions, dissected the bowel from the mesh and from the incision, resectioned the bowel around the scar tissue, and removed as much of the remaining Marlex mesh as he could. Dr. Canter also determined that a segment of Mr. Nelson's colon had been left at the site of the old colostomy during the previous surgery, and that a nearby hole in the small

---

1. Dr. McCreary's notes indicate that when Mr. Nelson was admitted to the hospital for Operation No. 3, the tunnel was as narrow as the doctor's little finger.

2. Five days later, on October 31, 1989, Dr. McCreary had to repair an incision which had split open when Mr. Nelson suffered a coughing spell. For the long-suffering plaintiff, this was Operation No. 5.

bowel was causing the infection around the site of the old colostomy. He removed the piece of colon and repaired the hole to prevent further complications.

On June 1, 1993, Mr. Nelson brought this action against Dr. McCreary for professional negligence. He alleged in his complaint that Dr. McCreary was negligent in using the Marlex mesh, in failing to inform Mr. Nelson about the potential complications that might arise from the use of Marlex mesh, and in failing to remove all of the Marlex mesh during Operation No. 4.[3] At the conclusion of the trial, the jury returned a verdict in Dr. McCreary's favor. Mr. Nelson filed a timely notice of appeal.

## II.

### THE "THEORY OF THE CASE" INSTRUCTION

After the parties had completed the presentation of their evidence, Mr. Nelson's attorney tendered to the court proposed instructions reflecting the plaintiff's various theories of negligence. One of these theories was that in connection with the use of the Marlex mesh, Dr. McCreary violated the applicable standard of care by failing to make a large enough tunnel through the abdominal wall to permit waste material to drain through, and that this failure caused or contributed to Mr. Nelson's subsequent illness. The parties disputed at trial, and continue to dispute on appeal, whether the plaintiff's theory in this regard was supported by expert testimony. The trial judge ruled that it was not. We disagree.

#### A. *Dr. Abrams' testimony.*

Mr. Nelson's expert witness, Alan Abrams, M.D., testified in support of this very theory. He stated that

the colostomy basically was not working because the exit through the abdominal wall and through the skin was too narrow, and it was oblique. In other words, as it came through the rectum itself, the tunnel

was too narrow to allow stuff to come through.

\* \* \* \* \* \*

Q. Okay. And how do you know ... that it [the colostomy] was too tight and that it was oblique, as you put it?

A. Because that's what Dr. McCreary describes in his admission or operative notes when Mr. Nelson came in the hospital the second time.

Mr. Nelson's counsel then specifically asked Dr. Abrams whether Dr. McCreary had performed the surgery in conformity with the applicable standard of care when he left an exit tunnel which was too narrow. Dr. Abrams' response was direct and to the point:

Q. In connection with placing the Marlex mesh on both sides of this muscle and doing it in such a way, as you described it, that the opening was insufficient to allow anything to pass through it, can you tell us whether or not you have an opinion as to whether or not that would comply or would not comply with the standard of care for a reasonably prudent physician?

A. Yes, I have an opinion.

Q. What is that opinion?

A. I believe that it is not.

Subsequently, during a lengthy colloquy with counsel regarding proposed instructions, the judge, after originally remembering Dr. Abrams' testimony correctly, was persuaded by defense counsel to change his mind:

THE COURT: Well you know—as I understood the testimony of your expert—no, no, you're right, he did say that he failed to make the opening wide enough and that was a violation of the standard of care.

MR. CARTER (COUNSEL FOR THE PLAINTIFF): That was one of the major parts of the case, Your Honor, talking about the colostomy and—

MR. FARLEY (COUNSEL FOR THE DEFENDANT): I take exception if Your Honor is going to instruct on that because that is not my recollection of the testimo-

---

**3.** The complaint did not include a specific allegation to the effect that Dr. McCreary failed to make a large enough exit through the abdominal

wall to permit effective drainage of waste material.

ny, that he said it is a deviation from the standard of care not to have made these openings wide enough.

THE COURT: Actually you are correct, you are correct, he said that the openings were not made large enough, he said that. He did not say that was a violation of the standard of care.

After the attorneys debated further and adhered to their differing recollections, the judge reiterated his agreement with the defense:

The problem with Dr. Abrams' testimony is that he did say that it was too small, no question about it, and he did say that the size of the opening in fact led to the obstruction in the stenosis, yes he did.

But when he talked about the violation of the standard of care he talked about the use of the Marlex mesh and the way it was used, the technique used and that was the violation of the duty of care.

He did not say that the size, to my recollection, that the size of the hole was a violation of the standard of care.

MR. CARTER: Your Honor, I think that is what he said in—and the defendant himself even admitted it under cross examination.

THE COURT: Admitted what?

MR. CARTER: He said that the size of the hole was too small and—

THE COURT: Counsel, I'm agreeing with you, I'm absolutely agreeing with you. The defendant said it was too small, your witness said it was too small, neither your witness nor the defendant said that it was a violation of the duty of care.

In light of his ultimate recollection of the record, which was indisputably contrary to the portions of Dr. Abrams' testimony which we have quoted,[4] the judge declined to instruct the jury on this aspect of Dr. Nelson's theory of the case. The judge did instruct in some detail on the plaintiff's other theories of negligence.

B. *Legal analysis.*

 "A trial court has broad discretion in fashioning appropriate jury instructions, and its refusal to grant a request for a particular instruction is not a ground for reversal if the court's charge, considered as a whole, fairly and accurately states the applicable law." *Psychiatric Institute of Washington v. Allen,* 509 A.2d 619, 625 (D.C.1986) (citations omitted). This court has held, however, that an informed choice among permissible alternatives, which is the essence of an appropriate exercise of discretion, requires that the judge's determination "be based upon and drawn from a firm factual foundation." *Johnson v. United States,* 398 A.2d 354, 364 (D.C.1979). Accordingly, "it is an abuse [of discretion] if the stated reasons do not rest upon a [sufficient] factual predicate." *Id.; see also In re J.D.C.,* 594 A.2d 70, 75 (D.C.1991). In the present case, the judge based his refusal to give the requested instruction on an incorrect recollection of Dr. Abrams' testimony, and his decision therefore cannot be sustained as a permissible discretionary choice.

 In any event, the judge's discretion does not extend to refusal to charge on a party's theory of the case. On the contrary, "[a] party is entitled to an instruction on his or her theory of the case if the instruction is supported by the evidence." *Nimetz v. Cappadona,* 596 A.2d 603, 605 (D.C.1991) (citation omitted). Moreover, in determining whether a proposed instruction on a party's theory of the case was properly denied, we review the record in the light most favorable to that party. *Wilson v. United States,* 673 A.2d 670, 673 (D.C.1996). "It does not matter that the evidence was minimal or was presented in a piecemeal fashion. All that is necessary is that there be some evidence supporting a party's theory of the case. If such evidence presents a question of fact for the jury, [the requesting party] is entitled to an appropriate instruction." *Hilord Chem. Corp. v. Ricoh Elec., Inc.,* 875 F.2d 32, 38 (2d

---

**4.** Mr. Nelson's complaint did not specifically include the "narrow tunnel" theory, see note 3, *supra,* and it may be that this omission contributed to the judge's incorrect recollection. Counsel for Dr. McCreary never claimed, however, that the expert testimony went beyond the allegations of the complaint, and we cannot sustain the judge's refusal to instruct on plaintiff's theory of the case on the basis of plaintiff's failure to plead that theory.

Cir.1989) (citation omitted); *accord, Carvel Corp. v. Diversified Mgmt. Group*, 930 F.2d 228, 230 (2d Cir.1991).[5]

Here, Dr. Abrams' expert testimony provided an evidentiary predicate for this aspect of plaintiff's theory of the case, and it was therefore error for the judge to refuse, upon request, to instruct the jury on that theory. We also conclude that the error was not harmless. To be sure, appellate courts are no longer "impregnable citadels of technicality," and not every trial error requires reversal. *See, e.g., R. & G. Orthopedic Appliances and Prosthetics, Inc. v. Curtin*, 596 A.2d 530, 539 (D.C.1991) (citations omitted). In order to hold that this error was harmless, however, we would have to be able to say with "fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)). We have indicated in a somewhat analogous context that refusal to instruct the jury on a criminal defendant's theory of the case is seldom, if ever, harmless. *See, e.g., Gethers v. United States*, 556 A.2d 201, 204 (D.C.1989) (citations omitted). In the present case, we are unable to say with "fair assurance" that the error did not substantially sway the judgment.

Moreover, the jurors in this case were confronted with a highly technical and even arcane discussion by expert witnesses of medical and surgical procedures which may well have been difficult for them to comprehend. One readily understandable concept— perhaps the *most* understandable one—was that Dr. McCreary left a tunnel from the abdomen which was too narrow to permit waste matter to drain away. It was this claim that the judge effectively removed from the jury's consideration. We conclude that Mr. Nelson was substantially prejudiced.[6]

## III.

### ISSUES ON REMAND

Because reversal is required as a result of the instructional error which we have discussed above, we need not reach several of Mr. Nelson's other contentions on appeal.[7] Two of the questions raised by Mr. Nelson will inevitably arise at any retrial, however, and we briefly address each of them.

#### A. *The expert who was paid by both sides.*

Mr. Nelson contends that the trial judge erred by refusing to disqualify Jerome Sandler, M.D., from testifying on Dr. McCreary's behalf as an expert witness. Dr. Sandler had previously been consulted and paid by the plaintiff. We decline to adopt the "automatic disqualification" rule apparently urged upon us by Mr. Nelson, and we perceive no abuse of discretion in the judge's ruling.

Some time in 1992, Mr. Nelson consulted an attorney concerning his potential malpractice claim against Dr. McCreary. The attorney forwarded Mr. Nelson's medical records to Dr. Sandler, a general surgeon, for Dr. Sandler's evaluation. Dr. Sandler reviewed

---

**5.** In *Carvel*, the court stated that "[a] litigant is entitled to have the jury instructed as to his claims and theories of law if supported by the evidence and brought to the attention of the court." 930 F.2d at 230 (citation omitted and emphasis added). The court then went on to quote the standard in *Hilord*. The use of the plural in *Carvel* is significant, for *Carvel* stands for the proposition that the *Hilord* principle applies where, as here, a party requests instructions on several different theories of his case.

**6.** Mr. Nelson also contends that the judge improperly declined to give another instruction requested by the plaintiff, this one concerning the removal of the contents of the colon during Operation No. 3. Dr. Abrams testified that "it was

not good judgment" for Dr. McCreary to open and drain the colon during that operation. Dr. Abrams never explicitly testified, however, that in doing so, Dr. McCreary violated the applicable standard of care. In light of our disposition of the appeal, we need not decide whether this testimony was sufficient to require the judge to instruct as requested.

**7.** Mr. Nelson claims (somewhat dubiously, given the jury's responsibility to assess the credibility of expert testimony) that the jury's verdict was against the "clear weight of the evidence." He also complains that the judge abused his discretion by improperly restricting the cross-examination of the defendant's expert witness.

the records and concluded that Dr. McCreary had not been negligent in his treatment of Mr. Nelson. He communicated his views in a letter to Mr. Nelson's former attorney. Dr. Sandler was paid $750 for the three hours that he spent in reviewing Mr. Nelson's records.

Mr. Nelson's attorney obtained the services of a different expert, and, as we have previously noted, he filed a complaint against Dr. McCreary for medical malpractice. During discovery, Dr. McCreary's counsel designated Dr. Sandler as an expert witness for the defense. Mr. Nelson's attorney noticed Dr. Sandler's deposition and, at that deposition, he confronted Dr. Sandler with the correspondence between the doctor and Mr. Nelson's prior counsel. Dr. Sandler asserted that he did not recall that he had previously reviewed Mr. Nelson's medical records until he was questioned at the deposition regarding the earlier report.[8]

Mr. Nelson's trial counsel filed a motion *in limine* to disqualify Dr. Sandler. He argued that the correspondence between Dr. Sandler and Mr. Nelson's previous counsel was protected by the attorney-client privilege and the physician-patient privilege, and that it constituted the work product of plaintiff's counsel. The trial judge denied the motion, concluding that the communications between Dr. Sandler and Mr. Nelson's attorney were not privileged or work product and that Dr. Sandler was not privy to any confidential information that could prejudice Mr. Nelson at trial.

"The admission or exclusion of expert testimony ... is committed to the trial court's broad discretion." *In re Melton,* 597 A.2d 892, 901 (D.C.1991) (en banc) (citation omitted). Although the courts have utilized a variety of approaches in this type of situation, *see, e.g.,* Kathleen M. Brennan, *Must the Show Go On? Defining When One Party May Call or Compel an Opposing Party's Consultative Expert to Testify,* 78 Minn.

L.Rev. 1191 (1994), we find the following articulation by United States District Judge Thomas J. Ellis especially helpful:

Analysis properly begins with an acknowledgment of the inherent power of federal courts to disqualify experts in certain circumstances. This power exists in furtherance of the judicial duty to protect the integrity of the adversary process and to promote public confidence in the fairness and integrity of the legal process. *See Paul,* 123 F.R.D. at 277–78,[9] *Great Lakes Dredge & Dock Co. v. Harnischfeger Corp.,* 734 F.Supp. 334, 336 (N.D.Ill.1990)..

While the existence of the disqualification power is clear, its exercise presents more difficult issues in certain circumstances. To be sure, no one would seriously contend that a court should permit a consultant to serve as one party's expert where it is undisputed that the consultant was previously retained as an expert by the adverse party in the same litigation and had received confidential information from the adverse party pursuant to the earlier retention. This is a clear case for disqualification. *See Marvin Lumber & Cedar Co. v. Norton Co.,* 113 F.R.D. 588 (D.Minn.1986); *Miles v. Farrell,* 549 F.Supp. 82 (N.D.Ill.1982). Less clear are those cases where, as here, the parties dispute whether the earlier retention and passage of confidential information occurred. In this event, courts should undertake a two-step inquiry:

First, was it objectively reasonable for the first party who claims to have retained the consultant, in this case Scott on behalf of Wang, to conclude that a confidential relationship existed?

Second, was any confidential or privileged information disclosed by the first party to the consultant?

*See Paul,* 123 F.R.D. at 278; *Great Lakes Dredge & Dock Co.,* 734 F.Supp. at 337.

---

8. Dr. Sandler's deposition is not a part of the record on appeal. The facts, as recited in this opinion, have been gleaned from Mr. Nelson's motion *in limine,* from the trial judge's ruling on that motion, and from Dr. Sandler's testimony at trial.

9. *Paul v. Rawlings Sporting Goods Co.,* 123 F.R.D. 271 (S.D.Ohio 1988).

Affirmative answers to both inquiries compel disqualification. But disqualification is likely inappropriate if either inquiry yields a negative response.

*Wang Laboratories, Inc. v. Toshiba Corp., et al.,* 762 F.Supp. 1246, 1248 (E.D.Va.1991); *see also Fenlon v. Thayer,* 127 N.H. 702, 506 A.2d 319, 321–23 (1986); *cf. Healy v. Counts,* 100 F.R.D. 493, 495–97 (D.Colo.1984).

In light of these authorities, we do not believe that Mr. Nelson has demonstrated that the trial judge abused his discretion in declining to disqualify Dr. Sandler. The judge found that no confidential or privileged information was disclosed to Dr. Sandler by the plaintiff, and Mr. Nelson has not demonstrated that this finding was clearly erroneous.

### B. *Contributory negligence.*

At trial, Dr. McCreary requested the judge to instruct the jury that Mr. Nelson was not entitled to recover damages from Dr. McCreary if Mr. Nelson was contributorily negligent and if his contributory negligence was a proximate cause of his injuries. Over objection, the trial judge gave the requested instruction. On appeal, Mr. Nelson contends that there was no evidence of contributory negligence or of proximate cause. In his appellate brief, Dr. McCreary eschews any discussion of the merits of the issue, but claims that because Mr. Nelson did not request a special verdict (or a general verdict with interrogatories) on the question of contributory negligence, the issue has not been preserved. *See Robinson v. Washington Internal Medicine Assoc., P.C., et al.,* 647 A.2d 1140, 1144–46 (D.C.1994).

Our disposition of this appeal on other grounds makes it unnecessary to decide whether or not Dr. McCreary's procedural objection is meritorious, although it is not obvious to us that the holding of *Robinson* applies to this record.[10] The substantive question whether the evidence in this case warrants an instruction on contributory negligence will doubtless arise again at any new trial. Accordingly, we think it appropriate to address it.

The defense claim of contributory negligence was based solely on the discussions between Dr. McCreary and Mr. Nelson prior to Operation No. 2. At that time, as we have seen, Dr. McCreary advised his patient that the colostomy should be resited from the left side of his abdomen to the right side. He warned that if this was not done, there was an increased likelihood of another hernia.[11] Mr. Nelson requested, however, that the colostomy remain on the left side, so that only one side of his abdomen would be disfigured. According to counsel for the defendant, it was this request that constituted contributory negligence on Mr. Nelson's part. Even if—and it is a big if—such an expression of preference by a patient could violate any applicable standard of care, we conclude that, on the record before us, there was no basis for the contested instruction.

We have found no District of Columbia authority directly in point. In *George Washington Univ. v. Waas,* 648 A.2d 178 (D.C. 1994), we recognized that where a patient's contributory negligence is alleged to have occurred *after* the physician's previous negligence, a majority of the courts have rejected the defense, holding that "the contributory negligence of the plaintiff must be contemporaneous with the negligence of the doctor." *Id.* at 180 (citations omitted). We also noted the existence of some case authority rejecting a strict simultaneity requirement. *Id.*

---

**10.** The record discloses that in this case *the defendant* requested a special verdict with respect to contributory negligence. The jurors never reached the question of contributory negligence because they found that Dr. McCreary was not negligent.

**11.** At trial, Dr. McCreary's attorney claimed that failure to resite the colostomy could also lead to obstruction and infection. There was no evidence, however, that Dr. McCreary warned Mr. Nelson about these possibilities. Because Mr. Nelson apparently was not apprised of the risk of obstruction or infection, he could not have been contributorily negligent in failing to guard against that risk.

The issue in this case, however, is somewhat different from the one in *Waas;* here, the conduct allegedly constituting contributory negligence was already complete when Dr. McCreary undertook to operate on his patient.[12]

We find a decision of the Supreme Court of Virginia especially instructive. In *Eiss v. Lillis,* 233 Va. 545, 357 S.E.2d 539 (1987), the plaintiff's decedent, Elynn Eiss, consulted the defendant, Frederick P. Lillis, M.D., after suffering a mild heart attack. Dr. Lillis prescribed a course of treatment that included the ingestion of Coumadin, a drug that decreases blood clotting but increases the potential for complications from hemorrhaging. Approximately a month after his heart attack, Mr. Eiss experienced pain and swelling in his legs. To counteract the pain and swelling, Mr. Eiss took approximately twelve aspirin tablets. Aspirin may exacerbate Coumadin's hemorrhaging potential.

On the day after ingesting the aspirin, Mr. Eiss was readmitted to the hospital. There, Dr. Lillis treated him with a mild dose of Vitamin K. Mr. Eiss' condition swiftly deteriorated, and he died a few days later from massive hemorrhaging.

Mr. Eiss' widow brought an action against Dr. Lillis, alleging medical malpractice. She presented expert testimony to the effect that Dr. Lillis had failed to treat Mr. Eiss aggressively, that the dosage of Vitamin K prescribed by Dr. Lillis was insufficient to be of therapeutic value, and that, among other therapies, Mr. Eiss should have been given fresh frozen plasma and fresh whole blood. Dr. Lillis contended that Mr. Eiss had been contributorily negligent by ingesting the aspirin. The trial judge instructed the jury on the defense of contributory negligence. The jury returned a verdict in Dr. Lillis' favor.

The Supreme Court of Virginia held that the trial judge had erred in instructing the jury with respect to contributory negligence. The court explained that the patient's alleged failure to exercise due care had predated the physician's negligence, and that Dr. Lillis therefore "cannot successfully contend that he is not liable for Eiss' death because, had Eiss not taken aspirin, Eiss would not have needed a doctor." *Id.* 357 S.E.2d at 543. The court continued:

> Were we to accept Dr. Lillis' argument, in any case where the patient was responsible for events that led to his hospitalization, the treating physician would not be liable for negligent treatment. We reject this argument. (Citations omitted.)

\* \* \* \* \* \*

> This case presents the obverse of *Lawrence.*[13] There, the contention was that events *after* the doctor's negligence amounted to contributory negligence. Here, the contention is that events *before* the doctor's alleged negligence amounts to contributory negligence. The result must be the same in both cases, *because the patients' conduct and the main act of negligence ascribed to the doctors were not contemporaneous and could not concur.*

*Id.* at 543–44 (emphasis added to final sentence).

In the present case, Dr. McCreary operated on Mr. Nelson after Mr. Nelson had objected to the proposed resiting of the colostomy. The plaintiff's alleged contributory negligence was complete at the time the defendant's alleged negligence occurred. Having agreed to operate on the plaintiff's terms, Dr. McCreary took his patient as he found him. Mr. Nelson's preference, like Mr. Eiss' ingestion of aspirin, was "merely a

---

12. We note that Mr. Nelson's case is also quite different from *Routt v. Ready,* 49 App.D.C. 305, 265 F. 455 (1920). In that case, the court held that the plaintiff was not entitled to recover against her physician after having refused to follow his advice regarding the appropriate treatment for her minor son. In *Routt,* however, the court was dealing with alleged negligence which occurred prior to the mother's refusal to follow

the defendant's advice. In the present case, on the other hand, the alleged negligence occurred after the patient had expressed his preference as to the siting of the colostomy.

13. *Lawrence v. Wirth,* 226 Va. 408, 309 S.E.2d 315 (1983).

factor that the doctor had to take into consideration in treating [his patient]." *Eiss, id.* at 543. Here, as in *Eiss,* the doctrine of contributory negligence has no application. *Accord, Cheek v. Domingo,* 628 F.Supp. 149, 151 (D.V.I.1986) ("the defense [of contributory negligence] is appropriate only where the patient's negligent act occurred during the treatment").[14]

## IV.

## CONCLUSION

For the foregoing reasons, the judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

---

14. Although the judge allowed the issue of contributory negligence to go to the jury, he expressed reservations as to whether Mr. Nelson's alleged contributory negligence was the proximate cause of Mr. Nelson's injuries. In light of our view that the record before us does not support an instruction on contributory negligence, we do not reach the issue of causation.