Present:  All the Justices

BRENDA LOWERY GRAVITT
                                          OPINION BY
v. Record No. 982269          JUSTICE LAWRENCE L. KOONTZ, JR.
                                       September 17, 1999
PHILLIP D. WARD, M.D., ET AL.


              FROM THE CIRCUIT COURT OF HALIFAX COUNTY
                       William L. Wellons, Judge


     On October 11, 1996, Brenda Lowery Gravitt instituted this

medical malpractice action against Dr. Philip D. Ward, an

obstetrician/gynecologist, and his employer, Fuller-Roberts

Clinic, Inc. (Fuller-Roberts), seeking $1,000,000 in damages she

alleged resulted from the defendants' negligent failure to

timely diagnose her breast cancer.  In response, Dr. Ward and

Fuller-Roberts filed grounds of defense, denying that they were

negligent and reserving the right to rely upon the defense of

contributory negligence.  The action was tried to a jury on the

issues of negligence and contributory negligence.  The jury

returned its verdict for Dr. Ward and Fuller-Roberts and the

trial court entered final judgment in accord with the jury's

verdict.  The sole issue we consider in this appeal is whether

there was sufficient evidence to support the trial court's

granting the jury instruction on contributory negligence

requested by the defendants.

In 1993, Gravitt, then age 46, had been a patient at Fuller-Roberts since 1966. Fuller-Roberts had performed her most recent mammogram on May 20, 1992. The mammogram report documented the fact that Gravitt had a family history of breast cancer. Gravitt's sister had died from breast cancer before the age of 50. Although the 1992 mammogram revealed no abnormalities in Gravitt's breasts at that time, there is no dispute that Gravitt was subject to an increased risk of cancer because of her family history of breast cancer and that she was aware of that increased risk.

On July 26, 1993, after discovering "a bruise and inverted sunken-in place" on her left breast, Gravitt made an appointment at Fuller-Roberts for later that day. Since Gravitt's regular doctor was unavailable, Dr. Ward examined her. Dr. Ward's chart notes initially indicated that Gravitt had complained of "a lot of redness and discomfort around the nipple of the left breast." After conducting a breast exam, Dr. Ward found what he described in the chart as a "[l]ittle glandular area at six o'clock adjacent to the nipple." However, he found no redness or gross tenderness. Dr. Ward further noted in the chart that since her condition "is resolving" he did not suspect that cancer was present because "if it was cancer, [he] would not expect resolution." Because Gravitt's mammogram from the previous year was normal, Dr. Ward chose to have Gravitt observe her

2

condition, indicating that he would recommend repeating the mammogram only if the problem persisted.

On August 30, 1993, Gravitt attended a previously scheduled appointment for a "Pap smear" with another doctor at Fuller-Roberts. During that appointment, Gravitt made no complaints about her breast.

On October 18, 1993, Gravitt called Fuller-Roberts for an appointment and was examined again by Dr. Ward. The events that took place during that visit were disputed at trial. Gravitt testified that she and her husband found a lump in her left breast sometime in early October. Gravitt further testified that she told Dr. Ward about the lump and that after conducting a breast exam he informed her that it felt like a cyst. According to Gravitt, Dr. Ward then asked her if she was having any pain. When she answered affirmatively he said, "[w]ell, that's a good sign because cancer doesn't hurt." Dr. Ward told her to take vitamin E to get rid of the cyst. To which Gravitt responded, "[t]his is wonderful. I'm glad it's just a cyst." Gravitt contends that they did not discuss the need for a mammogram.

At trial, Dr. Ward was never asked whether Gravitt informed him about the lump in her breast, and Dr. Ward never expressly stated that he had not been told about it. Rather, Dr. Ward testified that Gravitt's chief complaint during the visit was

3

premenstrual tenderness in her left breast.  Gravitt's chart did not reflect the presence of any other symptoms or that she had found a lump in her breast.  Dr. Ward conducted a complete examination of her breasts and found the breast tissue to be "freely mobile."  He did not locate any lesions, cancerous or otherwise.  According to Dr. Ward, part of a normal breast exam includes looking for dimpling or discharge and examining the patient's lymph nodes and glands for swelling.  Dr. Ward testified that if dimpling, discharge, or swelling had been found it would have been noted in the patient's chart.

Dr. Ward testified that he concluded that the tenderness in Gravitt's left breast was a result of fibrocystic changes associated with her menstrual cycle.  Therefore, he recommended that she decrease her caffeine intake and begin taking vitamin E.  Dr. Ward was aware of a history of breast cancer in Gravitt's family, including the fact that Gravitt's sister had died from breast cancer before the age of 50.  However, he chose not to order a mammogram because Gravitt had a normal mammogram within the past year and a half and her symptoms were consistent with a fibrocystic change.  Dr. Ward admitted that on occasion a mammogram would locate a cancerous abnormality not detected during a manual breast exam.

During the next few months, Gravitt went on a low-fat diet, took vitamin E, and exercised.  However, the discomfort in her

4

left breast continued and worsened.  After her arm began to hurt, Gravitt made an appointment at Fuller-Roberts for a physical and a mammogram on May 11, 1994.  The mammogram indicated a mass in her left breast.  A biopsy was performed on May 18, 1994 and two doctors informed Gravitt that she would need to have a mastectomy.  By this time, Gravitt's breast cancer had spread to her lymph nodes and metastasized throughout her body.

At trial, in addition to the foregoing evidence, the parties introduced conflicting evidence from medical experts regarding the standard of care applicable to this case.  Gravitt presented expert testimony from Dr. Stephen E. Zimberg and Dr. George M. Kemp that Dr. Ward breached the standard of care by not ordering a mammogram during either the July 26, 1993 or October 18, 1993 visits.  Dr. Kemp testified that he thought a diagnosis of Gravitt's breast cancer "could have been made and probably would have been made in July with a mammogram."  Dr. Ward presented expert testimony from Dr. George Cornell supporting his contention that the decision not to order mammograms during either visit had not violated the applicable standard of care.

At the close of all the evidence, Gravitt objected to Jury Instruction 15, which read as follows:

The defendants, in claiming contributory negligence as a defense in this case, have the burden of proving by the greater weight of the evidence that the plaintiff was negligent on October 18, 1993 in that the plaintiff failed to tell Dr. Ward about the lump in her breast, and that this negligence was a proximate cause of the plaintiff's injuries. Contributory negligence may be shown by the defendant's evidence or by the plaintiff's evidence.

Relying on Eiss v. Lillis, 233 Va. 545, 357 S.E.2d 539 (1987), and Lawrence v. Wirth, 226 Va. 408, 309 S.E.2d 315 (1983), Gravitt asserted that whether she told Ward about the lump was an issue of primary negligence not contributory negligence. The court granted the contributory negligence instruction.[*]

The gravamen of Gravitt's appeal is that the contributory negligence instruction should not have been granted because the trial testimony as a whole did not support it. Our discussion is necessarily limited to the resolution of that issue in the context of the facts of this particular case. Accordingly, we do not reach the broader issue raised at trial, viz., whether Gravitt's acts of alleged negligence were solely issues concerning the primary negligence of Dr. Ward.

With respect to the requirements for giving a contributory negligence instruction, we have said that "before either party

---

[*]In addition, the trial court granted Instruction 16 which provided, in pertinent part, that the jury should find its verdict for the defendants if it found "by the greater weight of the evidence that the plaintiff was contributorily negligent on October 18, 1993, and that her contributory negligence was a proximate cause of her injuries."

6

is entitled to an instruction on negligence or contributory negligence, as the case may be, there must be more than a scintilla of evidence introduced on the subject." Yeary v. Holbrook, 171 Va. 266, 287-88, 198 S.E. 441, 451 (1938); see also Ring v. Poelman, 240 Va. 323, 327, 397 S.E.2d 824, 827 (1990). "When a defendant in a negligence action relies on the contributory negligence of the plaintiff, the burden rests on the defendant to show such negligence was a proximate, direct, efficient and contributing cause of the injuries unless such negligence is disclosed by the plaintiff's own evidence or may be fairly inferred from all the circumstances." Charlottesville Music Center, Inc. v. McCray, 215 Va. 31, 37, 205 S.E.2d 674, 679 (1974). Moreover, "in order for a plaintiff's negligence to bar recovery, it must concur with that of the defendant . . . . [I]n the medical malpractice context, that means the patient's alleged contributory negligence must be contemporaneous with the main fact asserted as negligence on the doctor's part." Eiss, 233 Va. at 552, 357 S.E.2d at 543 (citing Lawrence, 226 Va. at 412-13, 309 S.E.2d at 317-18).

Instruction 15, and the related portion of Instruction 16, limited Gravitt's alleged negligence to the events of the October 18, 1993 visit at Fuller-Roberts. According to Gravitt's theory of the case, this was the last missed opportunity for Dr. Ward to have ordered a mammogram that would

have led to the discovery and successful treatment of her cancer. Thus, to resolve the issue presented our focus is necessarily drawn to the facts surrounding Dr. Ward's examination of Gravitt on that day. Specifically, we must consider the evidence to determine whether it presented a jury question whether Gravitt failed to act as a reasonable person would have acted for her own safety under the existing circumstances.

There is unequivocal evidence in the record that on October 18, 1993, Gravitt informed Dr. Ward of the lump in her left breast that she and her husband had detected. In contrast, there is no evidence in the record to directly dispute her testimony on this point. The testimony of Dr. Ward is conspicuously silent on this point, and thus did not raise a triable issue. The only evidence that, at best, indirectly tends to create a factual dispute over Gravitt's assertions is that Dr. Ward made no notation of a lump when he recorded his examination of her breast in the medical record. More significantly, there is no dispute that Dr. Ward conducted a full breast exam on Gravitt. Upon completion of this exam, Dr. Ward did not tell Gravitt that he had failed to detect any abnormality in her left breast. To the contrary, he made a positive diagnosis that the condition was not cancer, informing

8

Gravitt that her symptoms were caused by "fibrocystic changes" related to her menstrual cycle.

Neither Eiss nor Lawrence resolves the narrow issue presented by the facts of the present case. Here, if there was evidence of contributory negligence on Gravitt's part, it was contemporaneous with the main fact asserted as negligence on Dr. Ward's part on October 18, 1993. However, in Lawrence we noted that "[t]he physician-patient relationship differs substantially from that of the ordinary plaintiff and defendant." 226 Va. at 411, 309 S.E.2d at 317. This is so because of the great disparity in medical knowledge between "doctor and patient." Id. Despite that disparity, it is common knowledge that the presence of a lump in a woman's breast presents the possibility of the presence of a malignant tumor. This is particularly the case where there is also a family history of breast cancer. Thus, under those circumstances, the woman patient seeks to obtain, through a breast examination, the benefit of the doctor's medical knowledge to determine if a malignant tumor is in fact present in her breast, and, if so, to obtain appropriate treatment.

In this context, it is inconsistent with common knowledge and human experience that such a patient, concerned for her own safety, would fail to inform her doctor with the fact that her discovery of a lump in her breast was the very reason she sought

9

the doctor's examination of her breast. While admittedly this might occur in a given case, the evidence in the present case does not establish that such was a proper issue for the jury to determine. Rather, here there was no more than a scintilla of evidence that Gravitt failed to inform Dr. Ward of her discovery of a lump in her left breast. That evidence flows only from the evidence that Dr. Ward did not note in her chart that she had discovered a lump. That evidence further pales to no more than a scintilla in light of Dr. Ward's positive diagnosis of non-cancerous "fibrocystic changes" in Gravitt's left breast that he communicated to her.

For these reasons, we hold that there was not sufficient evidence from which the jury could reasonably find that Gravitt was contributorily negligent. Therefore, it was error for the trial court to give the contributory negligence instruction. Because the issue of primary negligence was principally a classic "battle of the experts," we cannot say that the erroneous instruction on contributory negligence did not affect the jury's determination of liability. See Clohessy v. Weiler, 250 Va. 249, 254, 462 S.E.2d 94, 97 (1995). We must presume the jury relied on the erroneous in reaching its verdict. Id.

Accordingly, we will reverse the judgment in favor of Dr. Ward and Fuller-Roberts and remand the case for a new trial.

Reversed and remanded.

10