8

# CIRCUIT COURT OF THE CITY OF ROANOKE

Brenda D. Harris
and Jan M. Harris,
Co-Administrators
of the Estate of
Mark C. Harris,
deceased

    v.

Patricia L. Schirmer *et al.*

March 7, 2016

Case No. CL12-205

BY JUDGE CHARLES N. DORSEY

Following hearing on Plaintiffs' objections to the proposed final order entering judgment on the verdict in favor of Defendants, in this case, there only remains need for ruling. Having reviewed the relevant pleadings, case law, trial transcript, and having considered the arguments of counsel made on and before December 21, 2015, Plaintiffs' post-trial objections are overruled and judgment on the verdict is entered for the reasons that follow.

## I. *Facts*

Brenda D. Harris and Jan M. Harris ("Plaintiffs") are the parents of and co-administrators of the estate of Mark C. Harris, deceased. On February 2, 2012, Plaintiffs brought suit against Patricia L. Schirmer, M.D., the Carilion Clinic, the Carilion Stonewall Jackson Hospital, and others (collectively

10

"Defendants"), for their alleged negligence and malpractice in the events that led to the death of their son, Mark, on April 7, 2011.

Plaintiffs nonsuited one Defendant, Carilion Clinic, by court order on February 8, 2013. On November 3, 2014, Plaintiffs moved without objection to nonsuit Carilion Stonewall Jackson Hospital and Jennifer Horn, and the Court ordered the nonsuit without prejudice, pursuant to Virginia Code § 8.01-380. The style of the case was thereby amended to "Brenda D. Harris and Jan M. Harris, Co-Administrators of the Estate of Mark C. Harris, deceased v. Patricia L. Schirmer, M.D., and Lexington VA Emergency Physicians, L.L.P." See Nonsuit Order, at 1, Nov. 3, 2014.

A. *Factual Background*

1. *April 6-7, 2011, Hospitalization*

On the night of April 6, 2011, Mark Harris ("Mark") was admitted to the emergency department at Carilion Stonewall Jackson Hospital in Lexington, Virginia with various symptoms, including: tremors, fever, diaphoresis, nausea, palpitations, restlessness, myalgias, and a headache. While his behavior throughout his hospitalization was abnormal and described as "unusual" (Trial Tr. 286, Mar. 9, 2015 (hereinafter Trial Tr. 3/9/10/15)), given these symptoms, Mark was "alert and oriented" and able to follow commands. Trial Tr. 91, 96, Mar. 11, 2015 (hereinafter Trial Tr. 3/11/15). There was no evidence that he was mentally incapacitated or unable to comprehend what the treating physicians were asking of him.

Prior to his admission to the emergency room, Mark had taken 600 mg of Dextromethorphan, an over-the-counter cough medication. As recently as April 3, 2011, Mark had also taken a Selegiline, a chemical inhibitor used to treat depression, which Mark had regularly been taking and was still in his system on April 6, 2011.

It is medically established that when one mixes Selegiline with Dextromethorphan, the risk of serotonin syndrome, a potentially fatal condition that affects specific neurotransmitters called serotonin, is likely. Trial Tr. 145-46, Mar. 10, 2015 (hereinafter Trial Tr. 3/10/15). Changes in serotonin can cause increased muscle activity like tremors, high blood pressure, high heart rate, hypertension, and tachycardia. *Id.* at 143-44.

Dr. Schirmer, the emergency room physician on April 6, 2011, attempted to treat Mark. It became known that Mark had been admitted to the same emergency department approximately two weeks earlier, on March 22, 2011, for an apparent overdose of Selegiline and Vyvanse, a central nervous stimulant used to control hyperactivity and muscle control. Given this information, Dr. Schirmer specifically asked Mark the question: "Have you taken any Selegline or Vyvanse?" Mark replied that he hadn't taken them regularly for "months." Dr. Schirmer, having knowledge of Mark's hospitalization on March 22, 2011, was skeptical of this answer. She

pressed him again for the truth stating, "But you were just here recently for a Selegiline and Vyvanse overdose, so you have taken these medications." Trial Tr. 3/11/15, at 42. Mark then conceded, "I haven't taken them since my — since I left the hospital." *Id.*

If Dr. Schirmer were to accept the truth of this statement — and she had every right to assume that he was telling the truth after she already called his bluff on whether he truly had not taken Selegiline for months — this would mean that Selegiline would have likely washed out of his system. *See* Trial Tr. 3/9/15, at 208-09 (Dr. Tharp, expert witness for Plaintiffs, noting that Selegiline has a long half-life, that it generally takes five half-lives to truly clear a drug out of one's system, and that for Selegiline this can be between 90 and 150 hours); id. at 209 (Dr. Tharp explaining that due to Selegiline's long half-life, an individual is supposed to wait two weeks after stopping Selegiline before starting other substances that can have an effect on serotonin); *see also* Trial Tr. 140-41, Mar. 12, 2015 (hereinafter Trial Tr. 3/12/15) (Dr. Luder, witness for Defendants, explaining that he admonished Mark Harris to ensure a two-week washout period). Thus, it would have been entirely reasonable for Dr. Schirmer to have ruled out serotonin syndrome as a likely cause of Mark's symptoms or, as she did, to have considered it a less likely diagnosis.

Based on Mark's vehement initial denial and subsequent untruthful qualification, the untruthfulness of which was not known to Dr. Schirmer, Dr. Schirmer concluded that an interaction between Dextromethorphan and Selegiline was one of the less likely causes for Mark's symptoms, and this was reflected in her differential diagnosis. It later became evident that Mark was indeed suffering from serotonin syndrome as a result of the interaction between the Selegiline in his system and his ingestion of Dextromethorphan.

### 2. *Important Events Preceding the April 6-7, 2011, Hospitalization*

When considering the facts underlying Mark's treatment on April 6-7, 2011, context is provided by some significant events leading up to this date, including the events surrounding the March 22, 2011, hospitalization and the two-weeks that followed.

In the spring of 2011, Mark was struggling in his studies at Washington and Lee University ("W&L"). He had been struggling for years with depression, but his disorder worsened at this time. He had been prescribed various sleeping medications and anti-depressants, including Selegiline, over the course of the academic year by Dr. Kirk Luder, a psychiatrist at the W&L counseling center. Dr. Luder had always advised Mark that when he switched from one anti-depressant to another, he needed to allow for a two-week washout period to avoid any dangerous overlap of medication. Trial Tr. 3/12/15, at 140-41.

On March 20-21, 2011, Mark overdosed on sleep medication and communicated to his girlfriend, Hannah Muther, he intended to kill himself.

12

The next day, March 22, 2011, Mark was taken to Carilion Stonewall Jackson's emergency room for an alleged suicide attempt by an overdose of Selegiline and Vyvanse. He was successfully treated at that time, and after several days of hospitalization was transferred to the University of Virginia ("UVA") for psychiatric treatment. While there, he explained that his March 22, 2011, suicide attempt was a result of stressors from school, his fraternity brothers, and his girlfriend.

After being discharged from the facility at UVA, Mark was given a prescription for oral Selegiline and was again told that if he planned to take any other drug, he must allow two weeks before starting it. From UVA, Mark was voluntarily admitted to an inpatient mental health facility, Region Ten, but only stayed for around twenty-four hours before returning to Lexington.

Mark resumed taking Selegiline on March 31, 2011, but discontinued its use on April 3, 2011. On April 4, 2011, Mark met with Dr. Luder at W&L and explained that he did not like the way that the oral Selegiline made him feel. Mark further explained that he was going to discontinue its use until he could obtain a transdermal Selegiline patch. Later on April 4, 2011, Mark purchased two bottles of Dextromethorphan on Amazon.com, which were shipped to his fraternity house.

On April 6, 2011, Mark was with his girlfriend, Hannah, in his room at the fraternity house. They attempted to become intimate, but Mark was unable to achieve an erection. Following this, Mark and Hannah had a discussion regarding the longevity of their relationship given that Hannah was planning to leave for Germany on a Fulbright scholarship at the end of the semester. Shortly after their conversation, Mark took an overdose of Dextromethorphan, which led to the hospitalization that is at the epicenter of this case.

### 3. *Mark Harris's Death and Autopsy*

During Mark's hospitalization on April 6, 2011, Dr. Schirmer and the nurses diligently worked to try and stabilize his symptoms, but to no avail. Despite a flurry of tests and treatments, Mark's condition did not ameliorate. He was eventually pronounced dead at 1:31 a.m. on April 7, 2011, at the age of twenty. Shortly after Mark's death, at around 2:00 a.m., Dr. Schirmer contacted his parents. She shared with them that her ultimate conclusion was that Mark had committed suicide.

In addition to denying having taken Selegiline recently, Mark was also heard saying in the emergency room, *inter alia*, "I got it right this time" and "I knew what I was doing." Trial Tr. 3/9/15, at 314-15. Regarding the March 22, 2011, overdose, Mark also allegedly told Dr. Schirmer that he was sorry that he had not died. Trial Tr. 3/11/15, at 52.

An autopsy was conducted and showed that Mark's death was a result of serotonin syndrome caused by acute Dextromethorphan and Selegiline

toxicity. The autopsy further showed that Selegiline was still in Mark's system although he had stopped taking it a few days prior to his admission to Stonewall Jackson on April 6, 2011.

## B. *Procedural Posture*

Plaintiffs filed their Complaint alleging medical malpractice, primarily against Dr. Schirmer, *see supra,* on February 2, 2012. In general, Plaintiffs alleged that Dr. Schirmer deviated from the required standard of care, knowing that such a deviation would cause, or likely cause, serious injury or death. They argued that Dr. Schirmer failed to appreciate, properly act on, diagnose, and treat Mark's condition.

In support of their case, Plaintiffs argued that Mark was not attempting to commit suicide and did not voluntarily bring about the serotonin syndrome on April 6, 2011. They dispute the relevance of the events of the two-week period pre-dating April 6, 2011, and argue that Mark's death was the sole result of Dr. Schirmer's failure to diagnose serotonin syndrome.

Defendants asserted three affirmative defenses as part of their theory of the case: illegal act, assumption of the risk, and contributory negligence. At trial, the defenses of illegal act and assumption of the risk were ultimately struck, but Defendants retained the defense of contributory negligence. Illegal act and assumption of the risk, in this case, would have occurred prior to Mark presenting at the hospital and would not have affected a physician's ability to diagnose and treat. In support of their theory of the case, Defendants argued that Mark Harris was attempting to commit suicide on April 6, 2011, and deliberately misled Dr. Schirmer to that end. They pointed to, *inter alia,* Mark's unambiguous denial of having recently taken Selegiline, and his statements in the emergency room that "[he] got it right this time" and "that [he] knew what [he] was doing." Defendants also introduced evidence of a posthumous investigation of Mark's computer revealing that he had looked up a news article about a young girl's fatal drug overdose, revealing a record of what drugs Mark had taken and when, and revealing certain emails suggesting Mark's suicidal intent.

Prior to, at the outset of, and during the trial, Plaintiffs objected to a variety of different testimony on the grounds of relevance and prejudicial effect. In addition, they objected to the introduction of any evidence pertaining to any of the Defendants' claimed affirmative defenses. Both parties also filed motions in limine, but as the parties proffered no agreed-upon or stipulations of fact, these motions were taken under advisement. The relevant facts pertaining to all of those objections will be articulated here in the analysis section.

The case went to trial on March 9, 2015, before a jury of eight selected jurors. The parties had previously agreed to leave an alternate on the jury if he or she was not used as an alternate. The trial lasted for five days.

14

On March 13, 2015, after the close of evidence, closing arguments, and after having received instructions, the jury retired to deliberate. Proposed Final Judgment Order at 2, Sept. 29, 2015 (herein "Proposed Final Judgment Order"). Despite objection by Plaintiffs, contributory negligence instructions were given.

After deliberation, the jury returned a verdict in favor of Defendants. Each juror was polled inquiring whether they concurred in the verdict. All jurors responded in the affirmative. *Id.* at 3.

A final draft order (the Proposed Final Judgment Order) was tendered to the Court by Defendants. Plaintiffs raised seven objections to the Proposed Final Judgment Order. *Id.* at 4-5. Rephrasing and stating in a slightly different order, Plaintiffs articulated the following objections:

(A) The Court erred in instructing the jury on contributory negligence because there was not more than a scintilla of evidence to support such an instruction;

(B) The Court erred in allowing evidence pre dating Dr. Schirmer's treatment of Mark under Rules 2:401 and 2:403 of the Rules of the Supreme Court of Virginia;

(C) The Court erred in admitting evidence going to the affirmative defenses of illegality and assumption of the risk before striking those defenses;

(D) The Court erred in refusing to grant a mistrial in lieu of striking the defenses of illegality and assumption of the risk and knowing that improper evidence had been admitted thereunto;

(E) The Court erred in instructing the jury on the Deadman's Statute, as there had not been sufficient corroboration; and

(F) The Court erred in refusing to give a limiting instruction on evidence relating to Mark's alleged suicide attempts and statements he made in the emergency room to Dr. Schirmer.

Plaintiffs also objected to Jury Instructions Nos. 4, 7, 10, 11, 11A, 15, and 15A. A hearing was held on December 21, 2015, to take up all post-trial objections.

## II. *Analysis*

### A. *Contributory Negligence*

Plaintiffs claim that the jury was erroneously instructed on contributory negligence. Specifically, they claim that "[t]here was not more than a scintilla of admissible evidence from which a jury could find that Mark Harris was contributorily negligent." Proposed Final Judgment Order, at 4. Over Plaintiffs' objection, evidence relating to Mark's purported contributory negligence (*i.e.,* denying having taken Selegiline recently) was admitted and the jury was given contributory negligence instructions.

Plaintiffs reiterated and renewed this objection at the December 21, 2015, hearing.

In support of their position, Plaintiffs are quick to point out that the Supreme Court of Virginia has considered seven cases involving trial courts issuing contributory negligence instructions in the medical malpractice context, with the Supreme Court finding error in each one. True as this is, however, the very fact that the Supreme Court has considered a number of these cases implies that contributory negligence may exist in the medical malpractice context under the right set of facts. The Supreme Court has never affirmatively declared that contributory negligence instructions are always improper in medical malpractice cases. All of the seven previous Supreme Court decisions involved facts that are distinguishable from the case at hand. In short, if there are cases under Virginia law where contributory negligence should be permitted in a medical malpractice action, this is one of these cases.

This review (i) states the governing law for giving contributory negligence instructions, (ii) applies the law to the facts of the present case, and (iii) distinguishes the Supreme Court's jurisprudence on the subject.

### 1. *Governing Law of Contributory Negligence in Medical Malpractice Context*

The defense of contributory negligence is "based on the objective standard whether a plaintiff failed to act as a reasonable person would have acted for his own safety under the circumstances." *Sawyer v. Comerci*, 264 Va. 68, 74, 563 S.E.2d 748, 752 (2002) (citing *Ponirakis v. Choi*, 262 Va. 119, 124, 546 S.E.2d 707, 710 (2001); *Artrip v. E. E. Berry Equip. Co.*, 240 Va. 354, 358, 397 S.E.2d 821, 823-24 (1990)). "The essence of contributory negligence is carelessness." *Id.* (citing *Ponirakis*, 262 Va. at 124, 546 S.E.2d at 711; *Artrip*, 240 Va. at 358, 397 S.E.2d at 823-24). The defendant has the burden of proving contributory negligence by a preponderance of the evidence. Contributory negligence may be proven "by the plaintiff's evidence or . . . [may be] fairly inferred from the circumstances of the case." *Id.* (citing *Southern Ry. v. May*, 147 Va. 542, 552, 137 S.E. 493, 496 (1927)).

In the medical malpractice context, because of the physician-patient relationship and the "great disparity in medical knowledge between doctor and patient, [a] patient is entitled to rely upon assurances made by [their] doctor and, generally, need not seek the opinions and services of others." *Lawrence v. Wirth*, 226 Va. 408, 412-13, 309 S.E.2d 315, 317 (1983).

Also, a plaintiff's contributory negligence "must be *contemporaneous* with the claimed defendant's negligence." *Chandler v. Graffeo*, 268 Va. 673, 681, 604 S.E.2d 1, 5 (2004) (citing *Sawyer*, 264 Va. at 75, 563 S.E.2d at 753; *Ponirakis*, 262 Va. at 125, 546 S.E.2d at 711; *Gravitt v. Ward*, 258 Va. 330, 335, 518 S.E.2d 631, 634 (1999); *Eiss v. Lillis*, 233 Va. 545, 552,

357 S.E.2d 539, 543 (1987); *Lawrence*, 226 Va. at 412-13, 309 S.E.2d at 317-18) (emphasis added). This means that the plaintiff's negligent act must be *concurrent* with the physician's negligent act. *Sawyer*, 264 Va. at 75, 563 S.E.2d at 753 (citing *Ponirakis*, 262 Va. at 125, 546 S.E.2d at 711) (emphasis added).

If a defendant is relying on the defense of contributory negligence, they "must establish a prima facie case of the plaintiff's contributory negligence." *Id.* Consequently, "a defendant who asserts a defense of contributory negligence is not entitled to a jury instruction on contributory negligence if that defendant only adduces a mere scintilla of evidence of the plaintiff's purported contributory negligence." *Id.* Stated differently, there must be more than a scintilla of evidence in order to warrant an instruction on contributory negligence. *See id.*

### 2. *Application of Facts to Present Case: Whether Contributory Negligence Instructions Were Appropriate*

The trial court is not to determine whether the evidence conclusively proved that Mark Harris was contributorily negligent, and, therefore, barred from recovery. Rather, the role of the court is limited solely to determining whether more than a scintilla of evidence supported giving the instruction. The jury is charged with weighing the credibility of witnesses and evidence, and determining the facts.

In the present case, Dr. Schirmer adduced more than "a mere scintilla of evidence of [the decedent's] purported contributory negligence" or at least has adduced enough evidence that contributory negligence could be "fairly inferred from the circumstances of the case." *Id.*; *see also id.* at 74, 563 S.E.2d at 752 (citing *Southern Ry.*, 147 Va. at 552, 137 S.E. at 496). It was not error to allow the jury to determine whether contributory negligence existed and, if so, whether such was proven by the greater weight of the evidence. Once the determination was made that more than a scintilla of contributory negligence evidence existed, the rest was up to the jury. By reaching its verdict, the jury independently determined that Mark Harris was indeed contributorily negligent.

#### a. *Scintilla of Evidence*

Defendants adduced more than a scintilla of evidence, which was relevant and admissible, to support the contributory negligence instructions in this case. See generally infra Part II.B for a discussion that the evidence relating to contributory negligence, including evidence about Mark's previous hospitalization, his statements in the emergency room, the findings of the posthumous investigation of his room, etc., was not irrelevant nor unfairly prejudicial. Defendants' theory that Mark intentionally overdosed

on Dextromethorphan, knowing that it would interact with the Selegiline in his system, was by no means an argument unsubstantiated by evidence.

The evidence supporting Defendants' theory non-exhaustively included: testimony relating to Mark's knowledge of the two-week washout period which was necessary when switching medications (Trial Tr. 3/9/15, at 208-09; Trial Tr. 3/12/15, at 140-41); testimony that Mark had died due to acute Dextromethorphan and Selegiline toxicity (Trial Tr. 3/9/15, at 197); testimony that Mark had specifically researched on his computer how Dextromethorphan meshed with his anti-depressant (Trial Tr. 3/11/15, at 276-77, 293-95); testimony that Mark had researched how other similarly situated persons had ended their life by mixing prescription medications (id.); Mark's affirmative denial of having taken Selegiline to Dr. Schirmer (id. at 42); and statements attributed to Mark that "[he] knew what [he] was doing" and "[he] got it right this time" (Trial Tr. 3/9/15, at 313-15. And while Mark was suffering from myriad symptoms, there is no suggestion that Mark was an unreliable witness, as there was testimony that he was "alert and oriented" and able to follow commands; *see supra*); testimony relating to Mark's unsuccessful suicide attempt on March 22, 2011, by overdose (Trial Tr. 3/11/15, at 42); and the eighty-four pill bottle of Selegiline with only eleven pills remaining. *Id.* at 288.

In short, without adopting either party's theory of the case, all of this evidence, taken in its totality, satisfies the scintilla of evidence standard and supports the giving of contributory negligence instructions.

### b. *Contemporaneousness*

Both Dr. Schirmer's purported negligence (*i.e.,* the failure to diagnose serotonin syndrome) and Mark's purported contributory negligence (*i.e.,* his deliberate denial of having recently ingested Selegiline) occurred sufficiently close-in-time to support the contributory negligence instructions in this case. It is important to distinguish that it was Mark's failure to disclose that he had Selegiline in his system that Defendants point to as his purported contributorily negligent act, and not the mere act of ingesting Dextromethorphan while knowingly having Selegiline in his system.

There is no dispute that if the negligent act had been the mere presence of Selegiline in Mark's system, assuming that act of itself was somehow negligent, then there could be no contributory negligence instruction because the contemporaneousness requirement would not have been met. See *infra* for a discussion on the case of *Eiss v. Lillis,* 233 Va. 545, 357 S.E.2d 539 (1987), where the Supreme Court of Virginia held that an allegedly contributorily negligent act that occurs prior to the alleged negligent act fails the contemporaneousness standard.

The proximity in time between the acts of negligence and contributory negligence in this case were much closer than in many of the Supreme Court's previous cases. *See, e.g., Chandler v. Graffeo,* 268 Va. 673, 604

S.E.2d 1 (2004) (contemporaneousness lacking because the purported contributorily negligent act, the decedent's failure to see a nephrologist the morning after being discharged from the hospital, even though it was technically impossible for the decedent to do so, occurred sufficiently after the defendant physician's wrongful discharging of the decedent); *Eiss v. Lillis,* 233 Va. 545,357 S.E.2d 539 (1987) (contemporaneousness lacking because the purported contributorily negligent act, taking aspirin on the advice of a separate doctor, happened sufficiently after the defendant physician had failed to ensure that sufficient precautions were taken to minimize the side-effects of the decedent's blood thinner); *Lawrence v. Wirth,* 226 Va. 408, 309 S.E.2d 315 (1983) (contemporaneousness lacking because purported contributorily negligent act was a delay in seeking a second medical opinion).

Although Mark's denial may have technically preceded Dr. Schirmer's failure to diagnose serotonin syndrome in some trivial sense, they both occurred at the hospital and close in time to each other. Going further, the two actions were inextricably causally linked together, with Mark's untruthfulness leading to Dr. Schirmer's ruling out serotonin syndrome as a likely cause of Mark's condition. But for Mark's deliberate denial, and the subsequent untruthful qualification that he hadn't taken Selegiline "since [he] left the hospital [on March 22, 2011]" (Trial Tr. 3/11/15, at 42), Dr. Schirmer would have been more able to narrow in on serotonin syndrome as the cause of his symptoms.

Because Dr. Schirmer's failure to diagnose and Mark's concealment of facts critical to his treatment were sufficiently concurrent with each other, the contemporaneousness requirement was satisfied. Accordingly, in the context of this ground, contributory negligence instructions should have been given.

### c. *Disparity in Medical Knowledge*

Concerning the disparity of medical knowledge issue, there is no dispute that Mark's medical expertise was vastly inferior to Dr. Schirmer's. However, the unique set of facts in this case mitigates the overall emphasis to be placed on the disparity.

Mark Harris was not the average layman generally seen in the typical medical malpractice case. This case is not one where Mark was wholly ignorant of what was happening to him. Mark knew the side-effects of Selegiline interacting with other drugs. Trial Tr. 3/11/15, at 276-77, 293-95. He researched the topic of fatal drug-mixing overdoses. *Id.* He was aware of the two-week washout period. Trial Tr. 3/9/15, at 208-09; Trial Tr. 3/12/15, at 140-41. He was aware that Selegiline would be in his system well after his last ingestion of the drug on April 3, 2011. Trial Tr. 3/9/15, at 208-09; Trial Tr. 3/12/15, at 140-41. Notwithstanding, a jury could conclude that he deliberately lied to Dr. Schirmer about his having taken the drug. Trial Tr.

3/11/15, at 42. Mark was also noted as having said, "I got it right this time" and "I knew what I was doing." Trial Tr. 3/9/15, at 313-15. Given these critical facts, the jury should have been permitted, though not required, to infer that Mark was intentionally trying to preclude Dr. Schirmer from applying her vastly superior medical expertise.

These facts present a starkly different situation from the Supreme Court cases wherein the patient was fully cooperative and forthcoming of information which would aid the doctor's treatment of him or her. This is not even the case where the patient honestly and in good faith merely omits or fails to state information necessary for his or her treatment. This is a case where the fact finder could have concluded that Mark made an affirmative misrepresentation to Dr. Schirmer that was material to her diagnosis and treatment. Thus, although Mark Harris was not a doctor, Defendants' evidence compels the conclusion that Mark's apparent inferiority in terms of medical expertise should not be given as much weight as it otherwise would. See also *infra* text discussing how the Supreme Court of Virginia, in *Gravitt v. Ward*, 258 Va. 330, 518 S.E.2d 631 (1999), qualified the importance of the disparity of medical knowledge when common knowledge or the circumstances of the case dictate otherwise.

Moreover, there are adverse public policy implications that would accompany a strict application of the medical knowledge disparity factor. Prohibiting a doctor from asserting the defense of contributory negligence in a situation where a patient deliberately lies to or misleads them would implicitly impose a burden on all physicians to assume that their patients are not telling them the truth, instead of the inverse. This would be entirely disfavored as a matter of policy, as such would render inefficient, and potentially disturbing or chaotic results for patients. And for doctors, such a policy would make their already difficult jobs overwhelmingly more complicated and subject them to even more malpractice litigation.

### 3. Supreme Court Jurisprudence

#### a. Lawrence v. Wirth

The Supreme Court of Virginia first addressed the issue of contributory negligence in the medical malpractice context in *Lawrence v. Wirth*, 226 Va. 408, 309 S.E.2d 315 (1983). In *Lawrence*, the plaintiff had discovered a lump on the lower part of her inner left breast in August 1977. The defendant, her physician, examined her but did not find a lump on that part of her breast. Instead, he removed some tissue from the upper part of her breast, which turned out to be benign. *Id.* at 410, 309 S.E.2d at 316. After the benign tissue's removal, the plaintiff continued to feel the lump of which she originally complained; however, when she questioned the defendant about it further, he did not respond. The plaintiff returned some weeks later for the removal of the sutures associated with the benign tumor and again

inquired about the lump, to which inquiry the defendant did not reply. Two months later, the plaintiff saw a second physician who determined that the lump was malignant ductal cancer requiring immediate surgery. *Id.* After the surgery, it came to light that the plaintiff had terminal cancer, which would have been cured if the tumor had been removed in August 1977. *Id.* at 411, 309 S.E.2d at 316.

The defendant in *Lawrence* argued that the plaintiff was contributorily negligent for having delayed in seeking a second medical opinion. At trial, the court issued a contributory negligence instruction, which the Supreme Court of Virginia found to be error. *Id.* at 411, 309 S.E.2d at 317. The Supreme Court held that due to the great disparity in medical knowledge, the patient is entitled to rely upon assurances made by the doctor and need not seek the opinions of others generally. *Id.* at 411-12, 309 S.E.2d at 317. The plaintiff's purported contributory negligence was also not contemporaneous because it occurred after the defendant's negligence. *Id.* at 412, 309 S.E.2d at 317. Moreover, the Supreme Court found no evidence that the plaintiff was negligent during the period of the physician's failure to appropriately examine the lump or respond to questions pertaining thereto. *See id.*

Juxtaposed with the present case, the following distinctions are evident. First, the *Lawrence* facts lacked the contemporaneousness present in the case against Dr. Schirmer. *See supra* Part II.A.ii(b). Moreover, the Lawrence decision was founded upon the patient's entitlement to rely on the advice, expertise, and counsel of his or her doctor. This case, on the other hand, involves the doctor's entitlement to rely on the patient's truthfulness in describing their symptoms and medical history. Just as a patient is entitled to rely on the expertise of their physician because of the disparity in medical knowledge between the two, a physician should be equally entitled to believe that their patient is truthful and completely forthcoming, absent obvious issues that may prevent such a result (*i.e.,* mental incapacitation, unconsciousness, traumatic head or other bodily injuries, etc.). Requiring each doctor to assume the opposite about their patient would lead to very troubling results. *See supra.*

### b. *Eiss v. Lillis*

Some years after *Lawrence*, the Supreme Court revisited the issue in *Eiss v. Lillis,* 233 Va. 545, 357 S.E.2d 539 (1987). In Eiss, the decedent saw the defendant physician for chest pains. After concluding that the decedent had suffered a mild heart attack, the defendant prescribed the decedent a blood thinner which had a major side effect of hemorrhaging unless properly stabilized. *Id.* at 547, 357 S.E.2d at 540. The proper method for stabilizing the dosage is taking prothrombin times of the patient and adjusting the dosage as a result. *Id.* The defendant, however, did not make sure that the decedent had gone through sufficient stabilization procedures. *See id.* at 547-48, 551, 357 S.E.2d at 540, 542. Later, after the advice of a

separate doctor, the decedent began taking aspirin for leg pain. *Id.* at 548, 357 S.E.2d at 540. The aspirin seemed to interact with the blood thinner, however, and the decedent's condition deteriorated. *See id.* at 548-50, 357 S.E.2d at 540-42. He died shortly thereafter. *Id.* at 551, 357 S.E.2d at 542.

The defendant argued that the decedent was contributorily negligent in taking the aspirin, and the trial court gave a contributory negligence instruction. The Supreme Court reversed and remanded. It held that the decedent's taking of aspirin was merely a factor which led to the decedent's death but that it did not proximately cause his death. *See id.* at 553, 357 S.E.2d at 543-44. It held that "[i]f aspirin compounds the effect of [the blood thinner] — which the expert testimony show[ed] it does — then [the defendant] was bound to treat for both. [The defendant] cannot successfully contend that he is not liable for [the decedent's] death because had [the decedent] not taken aspirin, [he] would not have needed a doctor." *Id.* at 553, 357 S.E.2d at 543. It continued further, "Were we to accept [the defendant's] argument, in any case where the patient was responsible for events that led to his hospitalization, the treating physician would not be liable for negligent treatment. We reject this argument." *Id.* (citations omitted). The Supreme Court also emphasized that the plaintiff's alleged negligence in *Eiss* occurred before the defendant's alleged negligence, and thus the contemporaneousness requirement was not satisfied. *Id.* at 553, 357 S.E.2d at 544 ("This case presents the obverse of Lawrence. There, the contention was that events after the doctor's negligence amounted to contributory negligence. Here, the contention is that events before the doctor's alleged negligence amounts to contributory negligence. The result must be the same in both cases, because the patients' conduct and the main act of negligence ascribed to the doctors were not contemporaneous and could not occur."). Accordingly, the Supreme Court held that the trial court erred in allowing the jury to consider contributory negligence. *Id.* at 553-54, 357 S.E.2d at 544.

The facts in *Eiss* are distinct from the present case in two important respects. First, just as with *Lawrence*, part of the holding in *Eiss* rested on the fact that the plaintiff's alleged negligence did not coincide with the defendant's alleged negligence. *See id.* at 553, 357 S.E.2d at 544. In the case against Dr. Schirmer, the contemporaneousness requirement is met. *See supra.* Second, in *Eiss*, the defendant physician knew of the actions underlying the plaintiff's alleged negligence (*i.e.,* the decedent's use of aspirin) and failed to treat it. In this case, Dr. Schirmer was unaware of both Mark's alleged contributory negligence (*i.e.,* that he lied about his having taken Selegiline as recently as two days prior to his hospitalization on April 6, 2011) and the actions underlying his alleged negligence (*i.e.,* that Mark had in fact ingested Selegiline). When Mark told Dr. Schirmer that he had not taken Selegiline, she was entitled to put the possibility of serotonin syndrome to the back of her mind and explore other possible causes of

his condition. In *Eiss*, the defendant knew of the causes of the decedent's ailments and failed to adequately address them. Here, Dr. Schirmer had no such knowledge. Dr. Schirmer did not know the causes of Mark's symptoms, largely, if not wholly, due to his affirmative misrepresentation.

### c. *Diehl v. Butts*

In *Diehl v. Butts*, 255 Va. 482, 499 S.E.2d 833 (1998), the Supreme Court of Virginia was confronted with a case where the decedent had injured his head and the defendant physician failed to inform the decedent about the extent of his injuries. The decedent had fallen from his bicycle and experienced a number of resulting headaches. *Id.* at 484, 499 S.E.2d at 835. Although there was some dispute as to exactly what the defendant told the decedent as to the severity of his head injury, *see id.* at 486, 499 S.E.2d at 836, the defendant generally instructed the decedent to watch for worsening symptoms. However, it was later discovered that the decedent had suffered a subdural hematoma on the right side of his head and a cranial skeletal fracture. *Id.* at 485, 499 S.E.2d at 835-36. One morning, the decedent was found unresponsive; he remained in a coma for two months, and was ultimately placed in a health care facility, where he passed away two years later. *See id.* at 487, 499 S.E.2d at 837.

At trial, the court gave a contributory negligence instruction, *see id.* at 491, 499 S.E.2d at 838-39, and the jury returned a verdict for the plaintiff, but fixed damages at $0. *Id.* at 488, 499 S.E.2d at 837. On appeal, the Supreme Court found that the trial court erred in giving this instruction, reversing the trial court on two grounds. First, the trial court's instruction in and of itself was erroneous and confusing to the jury as a matter of law. *Id.* at 491, 499 S.E.2d at 839 ("[T]he jury instruction contains an erroneous and confusing statement of law because the instruction implies that the tort concepts of contributory negligence and mitigation of damages are identical concepts when, in fact, they are separate and distinct tort principles."). The instruction itself said, "A patient is contributorily negligent when he neglects his health following his physician's treatment, even if that physician's treatment was negligent, and the patient may not recover for any damages resulting from his own neglect," but then continued by saying, "If you believe by a preponderance of the evidence that [the plaintiff] was contributorily negligent, then you may only consider this in determining the amount of damages, if any." *Id.* at 490, 499 S.E.2d at 838-39. Second, giving the instruction was error because the evidence did not support the notion that the decedent was, in any way, negligent in caring for his health. *Id.*

The *Diehl* case is distinguishable from the present case for two reasons. First, the *Diehl* decision rested largely on the fact that the trial court's instruction itself was confusing because it conflated two distinct legal principles: contributory negligence and mitigation of damages. *See supra*.

There is no such problem with the instruction in this case. Second, the facts of the present case are sufficiently distinct from *Diehl* as it relates to the patient's care. In *Diehl*, there was no contention that the decedent was not relying on, or cooperating with, the defendant's medical advice and opinion. Indeed, the decedent relied, to his detriment, on the defendant physician's characterization of the severity of the decedent's head injury. In contrast, more than a scintilla of evidence in the present case suggested that Mark Harris was intentionally not relying on, and not cooperating with, Dr. Schirmer's medical expertise in her efforts to diagnose and treat.

To the extent that Plaintiffs are arguing that Mark Harris would not have come to the emergency room of his own volition if he were not relying on Dr. Schirmer's care, this contention must be weighed against his behavior after he arrived. Whatever his ultimate reason for going into the emergency room, the fact that Mark availed himself of Dr. Schirmer's expertise by going to the emergency room must be counterbalanced by the fact that he knowingly and voluntarily withheld information that was critical to his care, and did not do so out of a *bona fide* or honest mistake.

### d. *Gravitt v. Ward*

The Supreme Court heard another case with similar facts to *Lawrence* in *Gravitt v. Ward*, 258 Va. 330, 518 S.E.2d 631 (1999). In *Gravitt*, the plaintiff had seen the defendant physician after having discovered abnormalities on her left breast. After examination, the defendant ultimately concluded that the abnormality was "resolving" and did not suspect cancer because "if it was cancer, [he] would not expect resolution." *Id.* at 332-33, 518 S.E.2d at 632. Moreover, despite a history of cancer in the plaintiff's family, the defendant elected a "wait and see" approach based on the fact that the plaintiff's previous years' mammogram was normal. *See id.* at 333, 518 S.E.2d at 632. After a couple of months, the plaintiff returned because she found a lump in her breast.

With regard to the follow-up visit, the plaintiff claimed at trial that the defendant found a lump, diagnosed it as a cyst, and did not order a resulting mammogram. *Id.* at 333, 518 S.E.2d at 632-33. On the other hand, the defendant asserted that the plaintiff's chief complaint at the follow-up visit was breast tenderness. Moreover, the defendant claimed that his chart did not reflect the presence of any lumps, and if there were such (including any discharge or swelling), it would have been noted in the patient's chart. *Id.* at 333, 518 S.E.2d at 633. He chose not to order a mammogram because "[the plaintiff] had a normal mammogram within the past year and a half and her symptoms were consistent with a fibrocystic change." *Id.* at 334, 518 S.E.2d at 633.

The plaintiff's condition worsened, however, and it was eventually discovered that there was a mass in her left breast which required a

mastectomy. Unfortunately, by this point, the plaintiff had cancer which had "spread to her lymph nodes and metastasized throughout her body." *Id.*

At trial, the defendant asserted that the plaintiff failed to tell him about the lump in her breast in the subsequent appointment. *Id.* at 334, 518 S.E.2d at 633. This contention was supported by his testimony that the plaintiff's primary concern was breast tenderness and that if there was a lump, it would have been reflected in his chart. *See id.* Over the plaintiff's objection, the trial court issued a contributory negligence instruction. *Id.* at 335, 518 S.E.2d at 633. On appeal, the Supreme Court of Virginia dismissed the defendant's contentions. The Court found that there was "unequivocal evidence" that the plaintiff had informed the defendant of the lump during the second appointment. The Supreme Court held:

> In contrast, there is no evidence in the record to directly dispute [the plaintiff's] testimony on this point. The testimony of [the defendant] is conspicuously silent on this point, and thus did not raise a triable issue. The only evidence that, at best, indirectly tends to create a factual dispute over [the plaintiff's] assertions is that [the defendant] made no notation of a lump when he recorded his examination of her breast in the medical record. More significantly, there is no dispute that [the defendant] conducted a full breast exam on [the plaintiff]. Upon completion of this exam, [the defendant] . . . made a positive diagnosis that the condition was not cancer . . . .

*Id.* at 336, 518 S.E.2d at 634.

The Supreme Court acknowledged the disparity in medical knowledge between patient and doctor, but concluded that "[d]espite that disparity, it is common knowledge that the presence of a lump in a woman's breast presents the possibility of the presence of a malignant tumor. This is particularly the case where there is also a family history of breast cancer." *Id.* The Court held that the plaintiff's failure to tell her doctor about the lump, when that was the very purpose of her availing herself of the doctor's expertise, would be "inconsistent with common knowledge and human experience." *Id.* at 336, 518 S.E.2d at 634-35. As such, the Supreme Court held that there was not more than a scintilla of evidence which suggested that the plaintiff failed to disclose the presence of the lump such that a contributory negligence instruction was not proper. *Id.* at 337, 518 S.E.2d at 635.

The present case can also be distinguished from *Gravitt*. The *Gravitt* case involved a patient who was honest and forthcoming, and evidence established that. The defendant's attempts to refute that evidence were hopelessly speculative. *Id.* at 336, 518 S.E.2d at 634 ("The only evidence that, at best, indirectly tends to create a factual dispute over [the plaintiff's] assertions is that [the defendant] made no notation of a lump when he

recorded his examination of her breast in the medical record."). In the present case, Mark Harris was the opposite of forthcoming, and sufficient evidence existed to corroborate that fact.

This is notwithstanding the fact that Mark Harris voluntarily went to the hospital, a point which Plaintiffs emphasize as support for their theory of the case. For if Mark had truly cared for his well-being and safety, he knew to disclose his Selegiline intake. Thus, assuming arguendo Plaintiffs' theory here (*i.e.,* that Mark voluntarily went to the hospital seeking relief from his symptoms and restoration to a healthy physical state) is correct, one would think that Mark would then do anything and everything to help Dr. Schirmer, or, at least, not actively thwart her efforts to resolve his health. He did not. Instead, he deliberately misled her.

Moreover, in *Gravitt,* the concept of medical knowledge disparity is evident and consequential. However, in the present case, more than a scintilla of evidence existed that Mark knew more about his condition, and the severity thereof, than the average layman. *See above.* He was not completely ignorant. Accordingly, just as the Supreme Court downplayed the medical knowledge disparity issue in *Gravitt* based on common knowledge and the circumstances of that particular case, *see supra,* undue emphasis on this disparity should be restrained under these facts. Even so, Dr. Schirmer included serotonin syndrome in her differential diagnosis, but discounted it due to Mark's statements.

### e. *Ponirakis v. Choi*

In *Ponirakis v. Choi,* the plaintiff had seen a primary care physician for "flu-like symptoms" and "dark-colored" urine. 262 Va. 119, 121, 546 S.E.2d 707, 709 (2001). During several urine tests, it was evident that the plaintiff had a significant amount of blood and protein in his urine. Although the plaintiff was so notified, the test results were classified as "normal." *Id.* at 121-22, 546 S.E.2d at 709. The plaintiff was never given a reason for why his urinary blood and protein levels were so elevated. *Id.* at 122, 546 S.E.2d at 709.

Some years later, the plaintiff saw the defendant, also a primary care physician, for chest pain. During that first examination with the defendant, the plaintiff was asked if he had "any serious diseases or operations." *Id.* In answering the question, the plaintiff did not mention anything about the previous elevated blood and protein levels in his urine. The defendant made no follow-up or specific questioning about the plaintiffs urinary or kidney systems. At trial, the plaintiff testified that he did not mention his previous urinary condition because he "didn't think it was serious at the time," and because the kidney x-ray had showed he was normal. *Id.* at 122-23, 546 S.E.2d at 709. As it related to this first visit with the defendant, the plaintiff was diagnosed with costochondritis, a condition causing chest pain and tenderness. *Id.* at 122, 546 S.E.2d at 709.

About six months later, the plaintiff returned to the defendant's practice because he noticed that his urine was "dark colored," as it had been some years previous. *Id.* at 123, 546 S.E.2d at 709. The defendant ordered some blood tests and a urine study which indicated that the plaintiff had blood in his urine. The plaintiff, after being referred to a specialist, was diagnosed with a kidney disease, had an unsuccessful kidney transplant, and required regular kidney dialysis. *Id.* at 123, 546 S.E.2d at 710.

In the plaintiff's medical malpractice suit against the defendant, the plaintiff argued that the defendant was negligent for failing to conduct a systems check, including the kidney and urinary systems, at the parties' initial meeting. *See id.* (analyzing the testimony of the plaintiffs' expert witness who testified that the defendant breached the applicable standard of care in failing to conduct a "review of systems" including asking specific questions about such subjects as blood in the urine). The defendant argued that the plaintiff was contributorily negligent for failing to disclose his previous urinary problems when asked about whether the plaintiff had "any serious diseases or operations." *See id.* at 124, 546 S.E.2d at 710. At trial, the court gave a contributory negligence instruction and the jury returned a verdict for the defendant. *Id.*

On appeal, the Supreme Court reversed, holding that "there was no evidence that [the plaintiff] was negligent in failing to disclose the prior episodes of blood and protein in his urine in response to the [the defendant's] question." *Id.* at 125, 546 S.E.2d at 711. Nothing in the record supported a finding that blood and protein in one's urine is *per se* a "serious disease." The record contained no evidence to suggest that a reasonable patient in a similar situation should have asked his physician to clarify the "serious disease or operations" question. Moreover, there was not enough evidence to support a conclusion that the plaintiff "knew, or that a reasonable person in his situation should have known, that the prior episodes of blood and protein in his urine indicated the presence of a 'serious disease.'" For these reasons, the Supreme Court opined that a contributory negligence instruction was improper. *Id.* at 126, 546 S.E.2d at 711.

Admittedly, the facts of *Ponirakis* are similar to the facts of the present case — the alleged negligent act of the plaintiff in both instances being the failure to disclose relevant information to the physician. However, there are significant distinctions between the two.

The first distinction involves the nature of the questioning that accompanied the withheld information. In *Ponirakis*, the plaintiff was asked whether he had "any serious diseases or operations," *id.* at 122, 546 S.E.2d at 709, and was placed in a position of being required to know whether his previous "normal" urine tests fell within the purview of what the defendant physician was asking. In essence, he was being asked a question about a prior professional "opinion," *i.e.* whether his urinary condition was a "disease" (as there was no suggestion that he had an operation). In contrast,

Mark Harris was asked an unequivocally clear question: "Have you taken any Selegiline?" Trial Tr. 3/11/15, at 42; *see also supra*. No "opinion" was involved; this was a straightforward question seeking "facts." No room was left to speculate about what Dr. Schirmer was asking. Mark's initial denial was clear and definite, id.; see also supra, albeit undeniably false. When pressed again for the truth, Mark misled Dr. Schirmer into thinking that he hadn't taken Selegiline for two weeks, when in reality he had taken some as recent as three days earlier. Summarizing, in *Ponirakis*, the question implicitly required the plaintiff to have knowledge of a medical conclusion. In the present case, the question was a narrow and specific factual inquiry; Mark was not required to make, or have knowledge of, any medical conclusion.

More tangential, yet also potentially relevant, is the fact that the first meeting between the plaintiff and the defendant in *Ponirakis* — when the alleged contributory negligence was said to have occurred — was instigated by the plaintiff's chest problems, not his urinary problems. Although the plaintiff's expert witness testified that the defendant nevertheless should have still investigated into the plaintiff's urinary history more, *Ponirakis*, 262 Va. at 123, 546 S.E.2d at 710, common knowledge would seem to suggest that a doctor should not be required to be equally preoccupied with investigating the patient's urinary blood and protein content when the patient's primary complaint is chest pains. In the case against Dr. Schirmer, on the other hand, Dr. Schirmer's question about Selegiline was directly relevant to a realistic diagnosis of Mark's symptoms.

The second distinction is that *Ponirakis* did not involve a situation where the plaintiff was intentionally or voluntarily concealing information to obstruct the physician's treatment, nor did the defendant allege such. There was no evidence in the record that plaintiff lied about his condition. And as the "essence of contributory negligence is carelessness," *e.g., id.* at 124, 546 S.E.2d at 711; *Artrip*, 240 Va. at 358, 397 S.E.2d at 823-24, the instruction was necessarily improper in that case. The present case, on the other hand, is vastly different in this regard. There was sufficient evidence to suggest that Mark Harris was intentionally concealing his ingestion of Selegiline or, at the very least, that he was careless in not being more forthcoming with the doctor.

Lastly, *Ponirakis* was largely focused on the objective standard that a reasonable person in the plaintiff's position should have known that, in response to the particular question of serious diseases, the physician would be seeking information such as an elevated protein count in one's urine, which condition had been classified and communicated to the patient as "normal." In fact, in *Ponirakis*, the Supreme Court dismissed a portion of the plaintiff's expert testimony by virtue of its having only considered a subjective, not objective, standard of the reasonable person. *See id.* at 126, 546 S.E.2d at 712. However, in the present case, nothing that Plaintiffs

have argued or put forth as evidence suggests that a reasonable person in Mark Harris' position would not be expected to comprehend the particular question asked by Dr. Schirmer and respond to it accurately.

### f. *Sawyer v. Comerci*

In the year following *Ponirakis*, the Supreme Court decided *Sawyer v. Comerci*, 264 Va. 68, 563 S.E.2d 748 (2002). The *Sawyer* case involved a decedent who had gone to the emergency room for pain on the right side of his abdomen. He was initially evaluated by the defendant, who concluded that the decedent should be fully admitted as a patient due to blood in his stool and an elevated white blood cell count. *Id.* at 71, 563 S.E.2d at 750-51. The defendant spoke with a specialist who, contrary to the defendant's belief, felt that immediate surgical intervention was not necessary. *Id.* at 72, 563 S.E.2d at 751. In the meantime, the decedent and his wife (the plaintiff and administrator of the decedent's estate), desired to leave the hospital, and did so against the defendant's wishes. *See id.* at 72-73, 563 S.E.2d at 751. Specifically, the defendant recorded a statement in her chart that the decedent and his wife "despite repeated explanation do not seem to understand the possibility of the seriousness of his condition." *Id.* at 73, 563 S.E.2d at 751. Instead of staying, the decedent agreed to immediately follow up with his primary care doctor, but this did not happen, despite the defendant's reiteration three days later that the decedent do so. *See id.* at 73, 563 S.E.2d at 751-52. The decedent instead returned to the emergency room by ambulance five days after the defendant's initial evaluation for shortness of breath and unusual coloration, and died the following day. *Id.* at 73, 563 S.E.2d at 752. The plaintiff estate brought suit against the defendant on the grounds that the defendant's acts or omissions breached the applicable standard of care in treating the decedent. *See id.* The defendant's alleged negligence was presumably that the defendant did not adequately communicate the urgency of the decedent's condition. *See id.* at 76, 563 S.E.2d at 753.

The trial court instructed the jury on contributory negligence on defendant's theory that the plaintiff was contributorily negligent for leaving the emergency room against the defendant's advice. The Supreme Court held that this was erroneous. Specifically, the defendant was:

> not entitled to a jury instruction on contributory negligence because she failed to establish a prima facie case that [the decedent] was guilty of contributory negligence. . . . [N]o physician with admitting privileges told [the decedent] that he should be admitted as a patient to the hospital on [the day in question]. [The defendant] did not make any record in [the

decedent's] medical chart that he should have been admitted
to the hospital on [the day, in question].

*Id.* at 74, 563 S.E.2d at 752.

Important for the Supreme Court in concluding that the contributory
negligence instruction was erroneous was the fact that the record contained
no evidence that the decedent understood the severity of his condition and
the possible consequences of leaving the hospital. *Id.* at 76, 563 S.E.2d at
753. Moreover, there was no evidence that the defendant told the decedent
"that he could die if he did not receive medical treatment." *Id.* Because
of this, and coupled with the fact that the specialist whom the defendant
consulted also did not believe that the decedent needed to be admitted, the
Supreme Court felt that the jury should not have been "permitted to infer
that a layman could be guilty of contributory negligence" for leaving the
emergency room under those circumstances. *Id.*

The *Sawyer* opinion is distinguishable from the present case. First, the
*Sawyer* decision was largely predicated on the decedent's lack of knowledge
(*i.e.,* not truly comprehending the seriousness of his symptoms and their
potential consequences). There is no such claim or issue in the present case.
To the contrary, there is more than a scintilla of evidence that Mark Harris
was entirely knowledgeable of what he was doing.

Second, the Supreme Court in Sawyer emphasized that under the facts
of the case—especially that (a) the defendant did not tell the decedent
that death was a possible consequence; and (b) the specialist whom the
defendant consulted also did not believe that the decedent needed to be
admitted — the jury should not have been "permitted to infer that a layman
could be guilty of contributory negligence" for leaving the emergency room
under those circumstances. *Id.* Under the facts of the present case, the same
conclusion cannot be so easily made. Mark Harris, although not a doctor,
had a more specialized knowledge than a layman. See *supra* text discussing
how the Supreme Court, in *Gravitt v. Ward*, 258 Va. 330, 518 S.E.2d 631
(1999), qualified the importance of the disparity in medical knowledge
when common knowledge or the circumstances of the case dictate
otherwise. Evidence existed to suggest that Mark truly comprehended the
consequences of his actions, including the consequence of deliberately
misleading Dr. Schirmer as to the possible cause(s) of his condition.

### g. *Chandler v. Graffeo*

The Supreme Court last addressed this issue in *Chandler v. Graffeo*,
268 Va. 673, 604 S.E.2d 1 (2004). In *Chandler,* the decedent was admitted
to the hospital complaining of sharp, mid-sternal chest pain, abdominal
pain, and numbness in his legs. He was never given a definitive diagnosis.
Less than a week later, the decedent returned under the same yet worsening
symptoms, wherein the defendant diagnosed him with a thoracoabdominal

aortic aneurysm, and instructed him to see a certain nephrologist the following day. *Id.* at 677, 604 S.E.2d at 2. The decedent was unable to get an appointment until the following week, and he collapsed and died at his home during this limbo period. *Id.* at 677, 604 S.E.2d at 3.

At trial, the defendant argued that the decedent was contributorily negligent for not seeing the nephrologist on the morning following his visit to the emergency room, *id.* at 681, 604 S.E.2d at 4, and the court gave the jury a contributory negligence instruction. *Id.* at 680, 604 S.E.2d at 4. The plaintiffs, co-administrators of the estate, retorted that the decedent's conduct was not negligent and, in any event, was not contemporaneous with the defendant's negligence. *Id.* at 681, 604 S.E.2d at 4-5. The Supreme Court agreed, holding that "there was no evidence of any negligence by [the decedent] that was contemporaneous with [the defendant's] discharging him from the hospital." The Court continued, "[The defendant] did not think [the decedent's] condition was life-threatening, and [the decedent], a layman, cannot be expected to know otherwise." *Id.* at 681, 604 S.E.2d at 5. Accordingly, the Supreme Court found that the trial court erroneously gave the instruction on contributory negligence. *Id.*

The *Chandler* case differs from the present case in the following respects. First, in *Chandler*, it was relatively easy to conclude that the decedent was not negligent for not having met with the nephrologist earlier, because it was factually impossible for the decedent to do so. There was no evidence that the decedent in *Chandler* exercised even an iota of bad faith; the decedent simply could not get an earlier appointment. In the present case, more than a scintilla of evidence was put forth establishing that Mark exercised bad faith. Second, the *Chandler* decision was centered on the disparity in medical knowledge between the decedent and the defendant. *See id.* ("[The defendant] did not think [the decedent's] condition was life threatening, and [the decedent], a layman, cannot be expected to know otherwise."). However, as noted, this concept should not be so controlling in the unique context of the case against Dr. Schirmer. *See* Part II.A.ii.(c) and accompanying text. Third, the contemporaneousness requirement was lacking in *Chandler*, whereas it is evident in the present case.

### 4. Conclusion

Although the Supreme Court has rejected contributory negligence instructions seven times previously, the Supreme Court has never ruled that contributory negligence is *per se* unavailable as a defense in a medical malpractice case. Thus, it is not outside the realm of possibility that a contributory negligence defense, and corresponding jury instructions, might be appropriate in a medical malpractice case at some point. Given the existing jurisprudence, of course, such a case would need to present truly unique facts. The facts of the present case certainly reach that threshold.

Only the jury could make the determination of contributory negligence, and they did. Accordingly, Plaintiffs' objection as to the affirmative defense of contributory negligence and the corresponding jury instructions is hereby overruled.

## B. *Relevance and Prejudice/Probative Value Objections*

In the Proposed Final Judgment Order, Plaintiffs objected to "the trial court's admission of evidence that pre-dated Dr. Schirmer's case, including evidence that Mark Harris had tried to commit suicide in the past or that he was trying to commit suicide on the day of his emergency room visit with Dr. Schirmer; evidence of 'vulnerability and protective factors'; and statements that Mark Harris made in the emergency room that he wanted to die." Proposed Final Judgment Order, at 4. Plaintiffs vehemently objected to this evidence prior to and throughout trial on the grounds that this evidence was irrelevant, immaterial, and unduly prejudicial.

### 1. *Governing Law of Rules 2:401 and 2:403*

In Virginia, "The admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion." *Bortzer v. Commonwealth,* 2015 Va. App. LEXIS 345, at \*3 (Nov. 24, 2015) (quoting *Main v. Commonwealth,* 7 Va. App. 10, 16, 371 S.E.2d 838, 842 (1988)). An abuse of discretion is present "only when reasonable jurists could not differ." *Id.* at \*4 (citing *Thomas v. Commonwealth,* 44 Va. App. 741, 753, 607 S.E.2d 738, 743, adopted upon reh'g en banc, 45 Va. App. 811, 613 S.E.2d 870 (2005)).

It is well established that "[e]vidence must be relevant to be admissible." *Payne v. Commonwealth,* 65 Va. App. 194, 776 S.E.2d 442, 453 (2015). Conversely, evidence that is not relevant is not admissible. Va. R. Evid. 2:402(a). The specific rule governing the admission of relevant evidence is outlined in Rule 2:401 of the Virginia Rules of Evidence. Under Rule 2:401, evidence is relevant if it has "any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence." *Id.* 2:401. Stated differently, "Evidence is relevant if it has any logical tendency, however slight, to establish a fact at issue in the case." *Ragland v. Commonwealth,* 16 Va. App. 913, 918, 434 S.E.2d 675, 678 (1993). Importantly, the Supreme Court of Virginia has emphasized, "[A] great deal [of discretion] must necessarily be left to the . . . court of trial, in determining whether evidence is relevant to the issue or not." *John Crane, Inc. v. Jones,* 274 Va. 581, 590, 650 S.E.2d 851, 855 (2007).

Rule 2:403 acts to limit the admission of otherwise relevant evidence in some narrow instances. Under Rule 2:403, "Relevant evidence may be excluded if: (a) the probative value of the evidence is substantially outweighed by (i) the danger of unfair prejudice, or (ii) its likelihood of

confusing or misleading the trier of fact; [or if] (b) the evidence is needlessly cumulative." Va. R. Evid. 2:403.

Importantly, the Rule 2:403 balancing test mentions that exclusion of relevant evidence based on prejudice can only be accomplished if the prejudice is *unfair. See id.* (emphasis added). This "reflects the fact that all probative direct evidence generally has a prejudicial effect to the opposing party." *Lee v. Spoden*, 776 S.E.2d 798, 806-07, 2015 Va. LEXIS 106 at *21 (2015) (citing, in an analogous context, *Powell v. Commonwealth*, 267 Va. 107, 141, 590 S.E.2d 537, 558 (2004) ("All evidence tending to prove guilt is prejudicial to an accused.")). The "mere fact that evidence is highly prejudicial to a party's claim or defense is not a proper consideration in applying the [Rule 2:403] balancing test." *Id.* at 807, 2015 Va. LEXIS 106 at *22. The Supreme Court of Virginia has iterated that "[a]ny prejudice in the form of the jury's perception of [the claims of a party] is not unfair prejudice such that its admission could properly be barred under Virginia Rule of Evidence 2:403(a)." *Id.* at 807, 2015 Va. LEXIS 106, at *21 (quoting *Egan v. Butler*, 772 S.E.2d 765, 2015 Va. LEXIS 86, at *8-9 (2015) (brackets in original)). As the Supreme Court has opined, "'unfair prejudice' refers to the tendency of some proof to inflame the passions of the trier of fact, or to invite decision based upon a factor unrelated to the elements of the claims and defenses in the pending case." *Id.* at 807, 2015 Va. LEXIS 106, at *21. Nevertheless, the Court has also observed that a party's direct evidence, the plaintiff's or the defendant's, is "rarely subject to exclusion on the ground that it would be unduly prejudicial." *See id.* at 807, 2015 Va. LEXIS 106, at *21 (quoting *Powell*, 267 Va. at 141, 590 S.E. 2d at 558).

## 2. *Analysis of Specific Objections*

In response to Plaintiffs' articulated objections, Plaintiffs were asked to point to the particular instances in the transcript where their objections were made and also explain the nature of the evidence alleged to have been improperly admitted. Due to the sheer number of objections, each objection is not analyzed individually below, but the objections are instead grouped together based on the nature of the evidence admitted. It is unnecessary to restate each as to each specific objection made at trial. It suffices to say that all of the objected-to evidence was relevant, and not unduly prejudicial, confusing, or cumulative.

In general terms, the Court finds that the objected-to evidence was relevant because it had a tendency to make the Defendants' theory of the case more probable, whether or not that view was ultimately correct. Plaintiffs were allowed to set out their view of the case (*i.e.,* that Mark Harris was the victim of Dr. Schirmer's negligent failure to diagnose and treat his serotonin syndrome), and were allowed to proffer evidence to that end. With these objections, Plaintiffs essentially attempted to restrict, obstruct, or hamper, by way of evidentiary analysis, both Defendants' ability to explain their

theory of the case (*i.e.,* that Mark Harris was trying to take his life and intentionally misled Dr. Schirmer to succeed in that endeavor), and the evidence that Defendants were allowed to proffer thereto. This contravenes the whole purpose of trials. *See* Trial Tr. 3/9/15, at 149, 162.

The situation here is analogous to, among other examples, precluding a defendant fire insurance company that is sued for not paying out insurance proceeds from arguing that the alleged fire was an intentional act of arson and putting on evidence to that effect; this would be entirely unjust. Plaintiffs should not be able to file suit, and present their evidence, but preclude Defendants from contesting their claims, and prevent Defendants from asserting claims of their own.

The evidence that Defendants propounded in their case was not frivolous or unsubstantiated. The evidence was prejudicial to Plaintiffs in the sense that it lessened their chances of success on the merits, but such is the case in every trial. The evidentiary rulings were not unfairly prejudicial. Plaintiffs did not demonstrate that the passions of the jury were so inflamed by the evidence that it unquestionably led them to render a verdict on an improper basis. Both sides presented their cases-in-chief and then tasked the jury with deciding who was correct.

### a. *All References to the March 22, 2011, Suicide Attempt*

Plaintiffs wished to exclude any and all references to the March 22, 2011, incident involving Mark's prior suicide attempt and hospitalization. They claim that such evidence was not relevant to the events of April 6-7, 2011, and caused undue prejudice to Plaintiffs.

Here, there can be no doubt that evidence of the prior suicide attempt was relevant under the definition of Rule 2:401, because it had a tendency to make Defendants' theory of the case more probable and Plaintiffs' theory less so. If Mark had been attempting suicide in similar fashion just two weeks earlier, it would make sense that his actions on April 6, 2011, could be motivated by a similar intent.

It is in this vein that Plaintiffs argue that the admission of this evidence led the jury to render its verdict on an improper basis. Admittedly, the nature of a prior suicide attempt, when viewed in a vacuum, is a potentially suggestive event. However, Plaintiffs have not established that the evidence inflamed the passions of the jury to such a degree that there could have been no difference of opinion among them as triers of fact. Plaintiffs have not pointed to any factors which suggest that the jury's verdict was based on an unrelated or improper element. Instead, the events of March 22, 2011, were instructive in helping the jury ascertain the general mindset of Mark Harris, his mental fragility, his vulnerability to future self-destructive behavior, and his general knowledge of overdosing and being treated for an overdose. That the jury heard evidence concerning Mark's previous suicide attempt did not automatically compel them to believe that the April 6, 2011, incident

was a suicide. The jury could have chosen to believe Plaintiffs' version of the events. They did not.

Moreover, Defendants rightly point out that Plaintiffs themselves, in opening statements, raised the issue of serotonin syndrome, Dr. Schirmer's knowledge thereof, and how a physician would respond thereto. This opened the door to Defendants' mentioning of the prior incident of serotonin syndrome (*i.e.,* the March 22, 2011, incident). As such, Plaintiffs' relevance and prejudice objections as to the March 22, 2011, suicide attempt are overruled.

   b. *All References That Mark Was Trying To Commit Suicide on April 6, 2011, by Overdosing on Dextromethorphan and Selegiline*

Plaintiffs object to each and any reference that Mark Harris was trying to commit suicide on April 6, 2011. As this was Defendants' central claim, this assertion was mentioned many times throughout trial. Indeed, all of Defendants' evidence went, in some way, to proving the truth of this theory.

Here, the objected-to evidence was relevant, probative, and not substantially outweighed by its prejudicial effect. This evidence was relevant in that it made Defendants' theory of the case more probable and Plaintiffs' theory less so. By this very definition, it was prejudicial to Plaintiffs' case. However, as *supra*, Plaintiffs did not establish that the prejudice was necessarily unfair, or that the prejudice substantially outweighed the probative value. This is in line with the Supreme Court's holding in *Lee v. Spoden* that the prejudice arisimg from the jury's perception of the claims of a party is not necessarily unfair prejudice, such that exclusion would be warranted. *See Lee,* 776 S.E.2d at 807, 2015 Va. LEXIS at *21 (citing *Egan,* 772 S.E.2d at 771, 2015 Va. LEXIS at *8-9). As such, Plaintiffs' objections on this point are overruled.

   c. *Statements Attributed to Mark to the Effect of "I got it right this time," "I knew what I was doing," or "It could kill me because I looked it up"*

Plaintiffs object to several statements attributed to Mark Harris in the emergency room. Specifically, Defendants put on evidence that Mark said to one of the nurses, Ms. Donna Lilley, "I got it right this time." Trial Tr. 3/9/15, at 313. In addition, Ms. Lilley testified that Mark kept saying "I'm sorry, I'm sorry," while repeating the Lord's Prayer. *Id.* at 314. Ms. Lilley also testified that Mark Harris stated, "I knew what I was doing." *Id.* at 315.

Earlier, when Defendants cross-examined the nursing supervisor, Ms. Carol Mason, they elicited another problematic statement attributed to Mark. Specifically, when speaking of the medicine he had taken, Mark said, "It can kill me." *Id.* at 289, 291. Ms. Mason further intimated that Mark knew the medication could kill him because "[h]e looked it up on the

computer." *Id.* at 291. Dr. Schirmer also testified that Mark told her that he was sorry that he had not died when he was admitted for the overdose on March 22, 2011. Trial Tr. 3/11/15, at 52.

Here, the statements were certainly relevant in that they had a tendency to make Defendants' theory of the case more probable and Plaintiffs' theory of the case less so. The statements went directly to Defendants' contention that Mark intentionally misled Dr. Schirmer as to whether he had Selegiline in his system. With regard to prejudice, the statements were only prejudicial insofar as they undermined the evidence Plaintiffs proffered. They were not inherently unfair and did not automatically compel the jury to render a verdict on an improper basis. They simply supported one side's theory of the case; they did not impermissibly inflame the passions of the jury. In this sense, the statements are no more prejudicial than is an eyewitness or fingerprint identification to an accused in a criminal case. As such, Plaintiffs' relevance and prejudice objections to the statements attributed to Mark in the emergency room are overruled.

### d. *References to Mark's Time at Region Ten, and the Two-Week Period Following the March 22, 2011, Suicide Attempt*

After Mark's overdose on March 22, 2011, he was transferred to the University of Virginia for psychiatric treatment. Trial Tr. 3/12/15, at 154-55. Later, he was voluntarily admitted to the Region Ten mental health facility, but stayed for only a short time before returning to Lexington. Plaintiffs object to Defendants mentioning any of this evidence on the same relevance and prejudice grounds.

On this issue, the evidence was relevant under the definition of Rule of Evidence 2:401. While references to his post-March 22 hospitalization treatment may have been irrelevant in isolation, the evidence all went to the ultimate issue of the case — whether Mark's behavior amounted to a suicide attempt and whether he deliberately or recklessly misled Dr. Schirmer about the Selegiline in his system. The evidence was material in helping the jury learn what drugs Mark Harris had in his system, in deciding whether he knew about them, and in ascertaining his state of mind. Furthermore, the evidence was helpful in allowing the jury to analyze whether Mark was sufficiently forthcoming on April 6, 2011. Prejudice from references to the events of the two-week period following Mark's March 22, 2011, hospitalization does not substantially outweigh their probative value; such references were appropriately limited, and were not unfairly prejudicial. As such, Plaintiffs' relevance and prejudice objections on this issue are overruled.

### e. *Article Found on Mark's Computer About Overdosing on Dextromethorphan and the Record Found About What Drugs He Had Taken*

Plaintiffs object to the admission of the posthumous investigation of Mark's room revealing that there was an article on his computer concerning a young girl who had died as a result of mixing drugs. Moreover, they object to Defendants' evidence that Mark's computer had another page open with a note keeping track of the amount of Dextromethorphan he was ingesting.

This evidence was certainly relevant to and probative of both parties' theory of the case. To the extent it opposed Plaintiffs' case, it cannot be said that the prejudice was unfair or that it substantially outweighed the probative value of the evidence. The jury was not forced to inescapably conclude that because of this evidence Mark indeed committed suicide and misled Dr. Schirmer to that end. Indeed, they were entitled to just as easily accept Plaintiffs' theory that Mark had looked up this information in a remedial mindset, after he had realized that the Dextromethorphan might interact with the drugs still in his system. Plaintiffs have not pointed to any legitimate support that the admission of this evidence completely precluded the jury's ability to differ in opinion. As such, Plaintiffs' relevance and prejudice objections on this issue are overruled.

### f. *References to an E-mail from Mark Concerning His Prescriptions and Mark's Mentioning of a Previous Suicide Attempt to Hannah; Evidence of Hannah's Understanding of Mark's Mood on April 6, 2011*

Plaintiffs object to Defendants' references to an e-mail in which Mark told his girlfriend, Hannah Muther, about his prescriptions and previous suicide attempt. Plaintiffs also object to the admission of Hannah's understanding of Mark's mood on April 6, 2011, including the conversations about their relationship and the failed attempt at intimacy.

This evidence had a tendency to make Defendants' theory of the case more probable and Plaintiffs' theory less so. It may have been irrelevant in isolation but it certainly had a bearing on the ultimate issue of the case. Mark's mentioning of his prescriptions goes to his knowledge of his physical state on April 6, 2011. Similarly, Mark's mentioning of a previous recent suicide attempt goes to his state of mind and informs the jury about one possibility as to why he was suffering the particular symptoms he was suffering on April 6, 2011, as well as casting light on whether he intentionally misled Dr. Schirmer. The same can be said about Mark's conversations with Hannah and their failed attempt at intimacy. As to the issue of prejudice, Plaintiffs have not shown that this evidence was so prejudicial to their case that reasonable triers of fact could not differ in opinion. As such, Plaintiffs' relevance and prejudice objections on this issue are overruled.

### g. *Missing Pills in the Bottle of Selegiline*

Plaintiffs raise relevance and prejudice objections to the admission of the 84-count bottle of Selegiline found in Mark's room which only had 11 pills remaining in it. Defendants used this evidence in support of their view that Mark knew he had Selegiline in his system and deliberately misled Dr. Schirmer in that regard.

As was stated in response to this objection at trial, Trial Tr. 3/11/15, at 271, this evidence was clearly relevant. The issues that Plaintiffs raise with this evidence are really issues of weight and not admissibility. It is undisputed that Mark had Selegiline in his system, and Defendants wanted to show that this bottle would explain why Selegiline was found in Mark's system during the autopsy. Moreover, Defendants wanted to show Mark's knowledge and state of mind when juxtaposed with his declaration that he hadn't taken Selegiline for "months" — or at least during the previous two weeks. This evidence is neither unfairly prejudicial nor would automatically lead the jury to render a verdict on an improper basis. As such, Plaintiffs' relevance and prejudice objections on this issue are overruled.

### h. *Dr. Luder's Testimony About Mark's Treatment, His Medications, and References to His Vulnerability Factors*

Plaintiffs object to Dr. Luder's testimony about his treatment of Mark Harris and the medications that Dr. Luder had prescribed to him. In addition, Plaintiffs object to Dr. Luder's mentioning of the various factors that he believed made Mark vulnerable to suicide.

This evidence was relevant to the ultimate issue of the case. It is undisputed that Mark's prescription history was of important consequence. Both Plaintiffs and Defendants necessarily discussed Selegiline, Dextromethorphan, and other drugs. The door was already open to discussing medications that Mark had been prescribed. Without admitting this evidence, the jury would have been left on its own to make too many inferential steps that bore on reaching an outcome in this case.

Mark's discussions with Dr. Luder about Selegiline just a few days before April 6, 2011, were especially probative in the case. The evidence went to both Mark's physical state of being as well as his accompanying mental state in the events leading up to his fateful hospitalization on April 6-7, 2011.

In addition to the testimony about Mark's specific treatment, the discussion on vulnerability factors was relevant, material, and probative. This evidence went to Mark's mental state and was helpful to the jury in deciding the facts of the case. The discussion itself did not compel the jury to find for Defendants. To the contrary, the vulnerability factors provided the jury with one possible way, not the only way, to explain the facts before them. Even if prejudicial to some degree, the prejudice certainly did

not substantially outweigh the probative value of the evidence. As such, Plaintiffs' relevance and prejudice objections on this issue are overruled.

### 3. *Conclusion* .

With respect to each of the Rule 2:401 and 2:403 objections, all of the objected-to evidence was relevant and not unfairly prejudicial. Defendants were allowed to put on evidence to support their theory of the case, just as Plaintiffs were allowed to do. Sufficient precautions were taken to ensure that the jury was not confused or misled.

### C. *Admission of Evidence on the Affirmative Defenses of Illegality and Assumption of the Risk*

Plaintiffs also object to "the trial court's admission of evidence on the affirmative defenses of illegality and assumption of risk," arguing that these defenses were improper and inapplicable, primarily because the evidence pertaining thereunto was "irrelevant, immaterial, and unduly prejudicial." Proposed Final Judgment Order, at 4. Plaintiffs filed a motion in limine to exclude evidence of such, which was ultimately taken under advisement. At trial, recognizing the inapplicability of illegality and the assumption of risk, the Court struck these defenses.

The Court struck these defenses for many of the same reasons that Plaintiffs articulated in their memorandum on this issue. As to illegality, Mark's actions of ingesting Dextromethorphan were not illegal. Dextromethorphan is an over-the-counter medication and even if Mark was ingesting it to "get high," such activity is not illegal. Moreover, even if Mark was engaged in some illegal activity, this in no way affected the standard of care that Dr. Schirmer owed him. She was obligated to treat him with the same care and diligence regardless of his preceding conduct. As to the assumption of the risk, the relevant case law is fairly clear that a patient cannot assume the risk of a doctor's malpractice. *See, e.g., Wright v. Kaye,* 267 Va. 510, 529, 593 S.E.2d 307, 317 (2004).

Plaintiffs now claim that by failing to grant their motion in limine but eventually striking the defenses at trial, impermissible evidence was allowed to be brought before the jury. This argument has no merit.

Plaintiffs' contention is flawed for one primary reason: the evidence was admissible for another purpose, contributory negligence. *See generally* Part II.A (discussing the applicability of contributory negligence as an affirmative defense for Defendants). In other words, even if there were error in not granting the motion in limine, the very same evidence Plaintiffs claim to have been impermissibly brought before the jury was permissibly proffered for the issue of contributory negligence. *See id.* As discussed in Part II.B.ii supra, the evidence was also relevant, probative and not unduly or unfairly prejudicial. *See supra.* And in any event, the decisions to grant,

deny, or take a motion in limine under advisement fall within the broad discretion of the trial court.

In fact, because it is "sometimes impossible to determine the relevance of certain evidence out of context," trial courts are instructed that "the better practice is to grant motions in limine sparingly, only in those cases: [i] where there is no reasonable possibility that the evidence, statements, or other actions sought to be excluded or controlled could be permissible; or [ii] where the motion relates to the opening statement and there is a significant risk of mistrial." Virginia Civil Benchbook for Judges and Lawyers § 1.09[2] at 1-89 to -90 (2014). Accordingly, Plaintiffs' objections on this issue are overruled.

### D. *Court's Refusal To Grant a Mistrial*

Plaintiffs also object to "the trial court's refusal to grant a mistrial once it struck the affirmative defenses of illegality and assumption of the risk" because "[t]he evidence admitted to support these defenses were likely to inflame the passions of the jury and to confuse them." Proposed Final Judgment Order, at 4; *see also* Trial Tr. 3/12/15, at 319-21 (specific motion for mistrial and the Court's response).

In general, "A mistrial should be declared when necessary to avoid the effects of error in law, juror prejudice or of misconduct by a party, attorney, juror, witness or judge which impinges upon the parties' right to a fair and just adjudication of their rights." Virginia Civil Benchbook for Judges and Lawyers § 3.02[12][b][ii] (citing *Robert M. Seh Co. v. O'Donnell*, 277 Va. 599, 675 S.E.2d 202 (2009); *Westlake Properties v. Westlake Pointe Ass'n*, 273 Va. 107, 639 S.E.2d 257 (2007); *Lowe v. Cunningham*, 268 Va. 268, 601 S.E.2d 628 (2004)). Whether a motion for mistrial should be granted is a matter "submitted to the trial court's sound discretion." *Castle v. Lester*, 272 Va. 591, 610, 636 S.E.2d 342, 353 (2006) (quoting Lowe, 268 Va. at 272, 601 S.E.2d at 630). If the evidence admitted is so overwhelming and prejudicial such that a cautionary instruction would not remove the effect of the impropriety, then the motion should be granted. *See Lowe*, 268 Va. at 273, 601 S.E.2d at 630-31 (quoting *Kitze v. Commonwealth*, 246 Va. 283, 288, 435 S.E.2d 583, 585 (1993) ("[I]f the prejudicial effect of the impropriety cannot be removed by the instructions of the trial court, the [adverse party] is entitled to a new trial.")). "A mistrial should not be declared if the error or misconduct will not prejudice the rights of any party." Virginia Civil Benchbook for Judges and Lawyers § 3.02[12][b] [iv] (citing *Thomas v. Wingold*, 206 Va. 967, 147 S.E.2d 116 (1966)). The ultimate determination is guided by several factors, namely the relevance of the evidence, the content of the evidence, the effect on the trier of fact, and whether the evidence was deliberately calculated to inflame the passions of the jury. *See Lowe*, 268 Va. at 273, 601 S.E.2d at 631 (citing *Kitze*, 246 Va. at 288, 435 S.E.2d at 585; *Meade v. Belcher*, 212 Va. 796, 799, 188 S.E.2d

211, 213 (1972); *Virginia Lincoln Furniture Corp. v. Southern Factories & Stores Corp.*, 162 Va. 767, 781, 174 S.E. 848, 854 (1934)).

Here, as discussed in Part II.B.ii(c) *supra,* the nature of the evidence that is the subject of Plaintiffs' objection on this issue was admissible for the issue of contributory negligence. Moreover, the evidence was relevant and not unfairly prejudicial. Even considering the arguable delay in striking the defenses of illegality and assumption of the risk, it cannot be said that the admitted evidence compelled only one outcome. The jurors were entitled to assign whatever weight they wanted to Defendants' theory of the case and the evidence which supported it. The jury's verdict cannot be summarily characterized as having been made on an improper basis simply because it was not the result Plaintiffs were seeking. As such, Plaintiffs' objection to the refusal to grant a mistrial is overruled.

## E. *Corroboration Under the Deadman's Statute*

Plaintiffs object to the Proposed Final Judgment Order on another ground, the Deadman's Statute, as codified in Virginia Code § 8.01-397. Specifically they claim that "Dr. Schirmer's testimony was not sufficiently corroborated," and therefore, the jury should not have been instructed on the Deadman's Statute. Proposed Final Judgment Order, at 4. Virginia Code § 8.01-397 reads, in pertinent part:

> In any action by or against a person who, from any cause, is incapable of testifying . . . no judgment or decree shall be rendered in favor of an adverse or interested party founded on his uncorroborated testimony. . . . The phrase "from any cause" as used in this section shall not include situations in which the party who is incapable of testifying has rendered himself unable to testify by an intentional self-inflicted injury.

The Deadman's Statute was designed to prevent "an opportunity for the survivor to prevail by relying on his own unsupported credibility, while his opponent, who alone might have contradicted him, is silenced by death." *Hereford v. Paytes*, 226 Va. 604, 610, 311 S.E.2d 790, 793 (1984). In determining sufficient corroboration, "[I]t is not possible to formulate any hard and fast rule[;] each case must be decided upon its own facts and circumstances." *Penn v. Manns*, 221 Va. 88, 93, 267 S.E.2d 126, 130 (1980) (quoting *Brooks v. Worthington*, 206 Va. 352, 357, 143 S.E.2d 841, 845 (1965)). "Corroborating evidence is such evidence as tends to confirm and strengthen the testimony of the witness sought to be corroborated — that is, such as tends to show the truth, or the probability of its truth." *Id.*

In *Diehl*, the Supreme Court of Virginia noted that "a higher degree of corroboration is necessary to satisfy the requirements [of the Deadman's Statute]" where the parties had a confidential relationship at the time of the

transaction which gave rise to the cause of action. *Diehl*, 255 Va. at 489, 499 S.E.2d at 838. A physician-patient relationship is one such relationship. *Id.* (citing *James v. Jane*, 221 Va. 43, 50, 282 S.E.2d 864, 867 (1980); *Limbaugh v. Commonwealth*, 149 Va. 383, 396, 140 S.E. 133, 136 (1927)).

Complete confirmation, however, is not necessary to satisfy the Deadman's Statute; only corroboration, which "gives more strength than was had before." *Penn*, 221 Va. at 93, 267 S.E.2d at 130 (quoting *Brooks*, 206 Va. at 357, 143 S.E.2d at 845). It is not required "that a survivor's testimony be corroborated on all material points." *Rice v. Charles*, 260 Va. 157, 166, 532 S.E.2d 318, 323 (2000).

Importantly, corroboration may be established by circumstantial evidence and "need not independently establish the fact but must itself tend in some degree to support an issue essential to the case . . . ." *Cooper v. Cooper*, 249 Va. 511, 516, 457 S.E.2d 88, 91 (1995). The corroborating evidence "need not emanate from other witnesses but may be furnished by surrounding circumstances adequately established." *Brooks*, 206 Va. at 357, 143 S.E.2d at 845 (citations omitted).

In terms of procedure, whether the requirement of corroboration under the Deadman's Statute has been satisfied "is usually an issue for the jury." *Whitmer v. Marcum*, 214 Va. 64, 68, 196 S.E.2d 907, 910 (citations omitted). The Supreme Court has held that the "proper practice in [Deadman's Statute cases] is for the court not to exclude the testimony of [the] interested or adverse party but to properly instruct the jury on the subject." *Arwood v. Hill's Adm'r*, 135 Va. 235, 241, 117 S.E. 603, 605 (1923).

At trial, Plaintiffs argued that the last sentence of Virginia Code § 8.01-397, relating to the statute's inapplicability for self-inflicted injury, was not controlling of the present case by virtue of causation. Trial Tr. 3/11/15, at 42-43. Specifically, they argued that Mark's inability to testify was not proximately related to anything he did prior to his admission to Stonewall Jackson on April 6, 2011, but that Dr. Schirmer's failure to diagnose serotonin syndrome was the proximate cause of his inability to testify. *See id.* at 43-44. It was not conclusively proven one way or the other, at the time of the objection, whether Mark's inability to testify came as a result of his self-inflicted injury or Dr. Schirmer's negligence. It was an issue for the jury to consider, as is usually the case under Virginia law. *Supra; see also* Virginia Model Jury Instruction No. 2.240. The issue was one of fact, and it is the prerogative of the jury to adjudge the facts.

Additionally, with regard to the self-inflicted injury clause of Virginia Code § 8.01-397, Plaintiffs asserted a public policy argument in support of their position. Trial Tr. 3/11/15, at 44. Though the General Assembly, not the Court, is normally the arbiter of public policy, the issue remained one of fact for the jury.

Concerning the sufficiency of corroboration, the relevant case law seems to make clear that corroboration can be made by other witnesses who were

present. Though not present during the exact query about Selegiline, at least two other nurses present during Mark's treatment on April 6, 2011, were able to corroborate the overall position that Mark's behavior was contrary to his health and self-interest. Trial Tr. 3/9/15, at 289-91 (Ms. Mason explaining she heard Mark say "It can kill me."); Trial Tr. 3/9/15, at 313-15 (Ms. Lilley explaining she heard Mark say "I got it right this time," and "I knew what I was doing."). The testimony of these nurses did not necessarily confirm the truth of what Dr. Schirmer claimed (*i.e.*, that Mark denied having taken Selegiline), but their testimonies do tend to confirm the probability thereof.

Furthermore, inasmuch as the trier of fact may consider circumstantial evidence in considering corroboration, *see supra*, there was a significant amount of circumstantial evidence corroborating Dr. Schirmer's testimony. For example, there were the circumstances of the March 22, 2011, hospitalization/suicide attempt. There was the evidence of Mark's mental condition in the days leading up to April 6, 2011. There was the evidence found on Mark's computer. There was the evidence of Mark's conversations with Hannah concerning the status of their relationship. There was the failed attempt at intimacy. There were the missing Selegiline capsules in the bottle in Mark's room. As such, Plaintiffs' objection to the instruction on the Deadman's Statute is overruled.

## F. *Refusal To Give a Limiting Instruction*

Plaintiffs further object "to the trial court's refusal to give a limiting instruction on its consideration of evidence relating to Mark Harris' alleged suicide attempts, and statements he made in the emergency room to Dr. Schirmer." Proposed Final Judgment Order, at 4.

At trial, when it became apparent that evidence relating to the March 22, 2011, overdose and evidence suggesting that Mark was attempting suicide with his April 6, 2011, conduct would be admitted, Plaintiffs petitioned the Court for a limiting instruction to the jury. Trial Tr. 3/9/15, at 229-30. The Court explained that it did not have a problem with doing so. Plaintiffs then asked for a limiting instruction to be repeated by the Court in every instance that the allegedly improper evidence was proffered. The Court replied that it did not have a problem doing so, but urged counsel to come up with the language. *Id.* at 230.

No such instruction was provided to the Court until the morning of closing arguments, on March 13, 2015, after all jury instructions had been argued and decided on the night before. One of Plaintiffs' counsel, who had tendered the proposed limiting instruction on the morning of March 13, 2015, had requested to be excused for the previous night's off-the-record discussions on instructions and the subsequent on-record hearing on instructions, in which all instructions given in the case were approved. Trial Tr., at 120-21, Mar. 13, 2015 (hereinafter Trial Tr. 3/13/15). The proposed

instruction tendered the following day was refused for fairness reasons and for want of timeliness.

Including the proposed limiting instruction would have been fundamentally unfair after both Plaintiffs' and Defendants' counsel had the entire night of March 12, 2015, to prepare their closing arguments in light of the finalized, agreed-upon instructions. The limiting instructions were untimely in the same vein, and the objection was otherwise waived by one counsel's voluntary election to not participate in the jury instruction hearing when other counsel handled all issues as to instructions and did not tender any limiting instructions. Furthermore, at the particular juncture it was offered, the limiting instruction would have run the risk of confusing the jury by putting undue emphasis on part of the evidence. *Id.* As such, Plaintiffs' objection as to the refusal to give a separate limiting instruction is overruled.

### G. *Renewal of Objection To Select Jury Instructions*

Lastly, in response to the Proposed Final Judgment Order, Plaintiffs renewed their objections to Jury Instructions Nos. 4, 7, 10, 11, 11A, 15, and 15A for the reasons stated on the record. The record reflects that Plaintiffs objected to Instruction No. 4, concerning the burden of proof, as being unnecessary. Trial Tr. 3/12/15, at 332. As to Instructions Nos. 7, 10, 11, 15, and 15A, Plaintiffs object on the grounds that they involved contributory negligence principles which were unsupported by the evidence and inapplicable. *Id.* at 335-41. The record reflects that no objection was ever made to Instruction IIA. *See id.* at 332-41.

Analyzing this issue, Instruction No. 4 was not unnecessary. It was Defendants' proffer of the applicable burden of proof in this case. While there was admittedly some duplicity in including both Plaintiffs' burden of proof instruction (No. 3) and Defendants' burden of proof instruction, the instructions did not confuse or mislead the jury on the legal concept of burden of proof; rather, the instructions amplified this principle to the jury. That there are two instructions addressing a legal concept which is potentially confusing to a layman does not automatically render one of them unnecessary.

Concerning Instructions Nos. 7, 10, 11, 15, and 15A, the Defendants' assertion of the defense of contributory negligence was not improper for the reasons discussed at length in Part II.A.ii *supra.* Plaintiffs' renewed objections to Instructions Nos. 7, 10, 11, 15, and 15A, are noted for appeal but overruled.

As to Instruction No. 11A, there was no objection made on the record, and therefore, the objection is overruled.

## III. *Conclusion*

In sum, each of Plaintiffs' objections to the Proposed Final Judgment Order is overruled. For the reasons stated, admitting evidence of contributory negligence and instructing the jury in that respect, were appropriate. Similarly, the Rule 2:401 and 2:403 rulings were not erroneous. As stated, the affirmative defenses of illegality and assumption of the risk could not have been struck at the motion in limine hearing. For the same reason, a mistrial should not have been granted. The Supreme Court's admonition that the "proper practice in [Deadman's Statute cases] is for the court to not exclude the testimony of [the] interested or adverse party but to properly instruct the jury on the subject," *Arwood*, 135 Va. at 241, 117 S.E. at 605, was followed. Additionally, refusing to grant the proposed limiting instruction for the reasons stated *supra,* and overruling the Plaintiffs' objections to the specifically aforementioned jury instructions was within the discretion of the Court. Accordingly, judgment is entered on the verdict in favor of Defendants by entry of the tendered Order.